COURTESY SANDWICH SHOP, INC., et al., Appellants, *v.* PORT OF NEW YORK AUTHORITY et al., Respondents. ARTHUR J. SILLS, Attorney-General of the State of New Jersey, Intervenor.

In the Matter of the PORT AUTHORITY TRANS-HUDSON CORPORATION, Respondent, Relative to Acquiring Title to Real Property in the State of New York and the State of New Jersey for Hudson Tubes Purposes. COURTESY SANDWICH SHOP, INC., et al., Appellants; LOUIS J. LEFKOWITZ, Attorney-General of the State of New York, Intervenor-Respondent.

First Department, February 19, 1963.

*Edward S. Greenbaum* of counsel (*Morris L. Ernst, Leo Rosen, Roger Bryant Hunting, Louis W. Bookheim, Jr., W. Bernard Richland, I. Lee Merin* and *Samuel M. Koenigsberg* with him on the brief; *Greenbaum, Wolff & Ernst,* attorneys), for appellants.

*Daniel B. Goldberg* of counsel (*Rosaleen C. Skehan, Joseph Lesser, Patrick J. Falvey, Isobel E. Muirhead* and *Lewis H. Sandler* with him on the brief; *Sidney Goldstein,* attorney), for respondents.

*Louis J. Lefkowitz, Attorney-General of the State of New York* (*Samuel A. Hirshowitz* of counsel; *Daniel M. Cohen* with him on the brief), *pro se.*

*Arthur J. Sills, Attorney-General of the State of New Jersey* (*Theodore I. Botter* of counsel), *pro se.*

RABIN, J. On these companion appeals we are called upon to determine the validity and constitutionality of chapter 209 of the Laws of 1962. Speaking generally, this statute would authorize the Port of New York Authority to acquire, through condemnation, the Hudson Tubes and appurtenant properties

and also to condemn 13 blocks in lower Manhattan for the purpose of developing a project known as the '' world trade center.''

Subsequent to the enactment of the concurrent statutes by New York and New Jersey, an action was commenced by persons having an interest in the property sought to be condemned, for a declaration that the statute in question is unconstitutional and is invalid for other reasons. Plaintiffs in that action moved for a temporary injunction restraining the proposed — then imminent — condemnation of the tube properties. This motion was denied by an order entered on July 17, 1962. An appeal was taken from this order and is now before us.

Following the commencement of the declaratory judgment action the Port Authority, through a subsidiary,* commenced a condemnation proceeding to take over the tube properties. In that proceeding three orders were entered on July 26, 1962, which (1) granted the petition for an order of condemnation; (2) granted an order of possession; and (3) denied a cross motion by appellants to dismiss the condemnation petition. The appeals taken from these orders are likewise before us for consideration.

The appellants urge that that portion of the act which authorizes the creation of a trade center is unconstitutional and that by reason of that invalidity the entire act must fall. In consequence, they assert that there may be no condemnation of the tube properties. They likewise state that if the act be declared invalid the temporary injunction applied for in the declaratory judgment action should be granted.

The Justices at Special Term made no determination as to the constitutionality of that portion of the act involving the trade center. The Justice considering the application for a temporary injunction held that the validity of that portion of the act would be considered at the time of the trial of the declaratory judgment action and that the issue could likewise be raised in connection with the condemnation proceeding. The Justice in the condemnation proceeding thought it unnecessary to pass upon that question and did not do so.

The threshold question is whether it would be permissible to allow condemnation of the tubes if the trade center portion of the act be declared invalid. If, in that circumstance, such condemnation be not permissible, must we not now consider the constitutionality of that portion of the act.

---

* The statute in question permitted the Authority to make use of a subsidiary corporation if it found it "necessary, convenient or desirable" to do so. (L. 1962, ch. 209, § 14.) The Port Authority Trans-Hudson Corporation is the subsidiary employed for that purpose.

As indicated, the statute contemplates two projects which the Legislature, had it so desired, might have set up as being independent of each other. However, section 18 of the act entitled "Severability" appears to mandate that they be considered "as a unified project". While the severability clause — as does the traditional severability clause — provides that the invalidity of any portion of the act "shall not affect or impair the validity of the remainder of this act", it also contains a limiting provision as follows: "so long as the act or remainder of the act shall nonetheless permit the effectuation, as a unified project, of the Hudson tubes, Hudson tube extensions and the world trade center".

What is the effect of that limiting provision? The intention of the Legislature is clear. It intended that the Hudson Tube project and the world trade center project stand or fall together. To permit one to stand if the other should be declared invalid would be nullifying the legislative intention — so clearly expressed — that they be considered as a unit. It would, in effect, be rewriting the legislation and constitute an invasion of the legislative domain. That the Legislatures of New York and New Jersey wrote the unification provision as a mandate is evident from the history of the legislation. In 1961, New York enacted a law essentially similar to the 1962 law, except that it permitted the Port Authority to effectuate the trade center and the tube project together, or either of them standing alone. New Jersey, however, did not join in that legislation. However, it did pass concurrent legislation when the 1962 statute contained the unification clause now being considered.

We conclude therefore, that if the trade center phase of the statute should for any reason be declared invalid, the Authority may not be permitted to take over the tubes. In that conclusion there is unanimous agreement by all the parties to this litigation.

In the light of the foregoing it was error for the condemnation court to refuse to consider and pass upon the constitutionality of the trade center authorization. It was likewise error for the court, in the declaratory judgment action, to fail to decide that question for, in determining whether or not an injunction should issue — even though it be a temporary one — that question was squarely before it (see *Fifth Ave. Coach Lines* v. *City of New York*, 11 N Y 2d 342).

The act gives the Authority the power of condemnation with respect to each of the projects. Of course, without such power the statute would serve no useful purpose. The Legislature has the power to authorize the Authority to condemn. However,

the condemnation must be for a public purpose and, unless it be for such purpose, no such authority may be granted. In the light of that fundamental principle we examine the several sections of the statute.

No one doubts that the operation of the Hudson Tubes would constitute a public purpose. Nor would it be improper to take the buildings presently erected over the existing terminal. It is asserted that the land on which these buildings stand is needed for the improvement and the expansion of the existing facilities, or for the construction of a new terminal. If that be so then the buildings may properly be condemned at the time the tubes themselves are taken. In any event they now stand over the terminal and they cannot be segregated from it. We might say, in passing, that if a new terminal be erected on the land so condemned, the construction of a building, or buildings over it that will yield incidental revenue, would appear to be permissible. (See *Bush Term. Co.* v. *City of New York*, 282 N. Y. 306.)

We now examine that section of the act which authorizes the creation of a trade center. Does it authorize condemnation for other than a public purpose? Whether it does is for the courts to decide (*Denihan Enterprises* v. *O'Dwyer*, 302 N. Y. 451, 457; *Matter of New York City Housing Auth.* v. *Muller*, 270 N. Y. 333, 339). That the project may be desirable, or that it may have some indirect public benefit is not the equivalent of a public purpose (*Matter of New York City Housing Auth.* v. *Muller, supra,* p. 343). To conclude otherwise could well result in a rule or law that the power of eminent domain may be exercised in almost any situation where some nexus with the public good may be established.

There is no question but that the creation of a world trade center, in concept, is a public purpose. In this connection it is argued that all we need look to is the concept. However, we may not stop at that point. We must examine the statute to see if the powers granted the Authority to effectuate that concept are not too broad. It is argued that the constitutionality of these powers should be determined progressively as the several contemplated proceedings to acquire particular pieces of property are institutued.* There are some basic and fundamental objec-

---

* It is interesting to observe that while the Authority has been given the extraordinary power to condemn 13 square blocks of Manhattan, there has not as yet been submitted any detailed finally accepted plan as to the manner of the development of that large area. Had such a plan been submitted it might well have allayed fears of the possibility of the use of the land for purposes not properly related to Port activities. However, we do not base our determination on the failure to submit such detailed plans.

tions to this approach. Implicit in the severability clause is a direction that such course be not followed. In making the Hudson Tubes and the world trade center a unified, nondivisible project, it in effect required that the decision as to the validity of the world trade center be made at the time of the taking of the tubes should condemnation proceedings with respect to the tubes be the first step in the effectuation of the purposes of the statute. A subsequent finding of the unconstitutionality of the world trade center provision might leave the Port Authority with a well-advanced, or a completed tubes project, without the possibility of effectuating the world trade center.* Such a result the Legislature expressly prohibited. There is no disagreement among the parties in this regard. That is not to say that the Authority may not proceed with the tube project in advance of the trade center, provided, of course, that portion of the act with respect to the trade center is not, on its face, unconstitutional.

A further objection to such an approach is that the parties whose properties might be the subject of condemnation might not have a sufficient opportunity — before an actual takeover — to present the question as to whether a public use is contemplated. The Court of Appeals in *Fifth Ave. Coach Lines* v. *City of New York* (11 N Y 2d 342, *supra*) held that notice must be given with respect to the institution of proceedings to determine the amount of compensation to be paid for the taking of property and also on the question of public use. It held however that such notice need not be given prior to the taking of title and more particularly, prior to the taking of possession. While the nature of the property condemned in the *Fifth Ave. Coach* case was such that the *status quo* could possibly have been restored if it should have been subsequently found that the property was not taken for a public use, in the proceeding which we are now considering it may very well be that the opportunity to determine the question of public use will, as a practical matter, be foreclosed. The bulldozers may come before the trial. Such a contingency may be avoided by a present consideration of the validity of the trade center project as written. For, in considering the constitutionality of the statute we must look not to what the Port Authority might do with the property it seeks to condemn, but rather to what the statute authorizes it to do. It would seem then that the appropriate time to determine the constitutionality of the entire world trade center project is now

---

* The briefs of the Port Authority seem to indicate that it is not clear even at this time that the effectuation of the world trade center project is feasible.

rather than later in piecemeal fashion.* We do not consider the constitutionality of the act by what the Authority might do in the future. We assume that it will stay within the powers given by the statute. Indeed, we will even assume that it will not exercise those powers which may be deemed to be unconstitutional. However, we must determine the constitutionality of the act by the powers it does give rather than by those which might be exercised.

Acts of parties may very well be deemed unconstitutional although done under an act which is constitutional. The converse is also true. Parties may act in a manner which would be considered constitutional although the statute itself may be unconstitutional. However, in the latter case we must strike the statute. Cases which construe acts of parties rather than the statute itself, of course are inapposite.

If the statute authorizes not only the condemnation of private property for a public purpose, but also permits condemnation for nonpublic purposes — unless the latter can be properly excised — the statute must be declared unconstitutional. In considering whether this statute does offend in that respect we must be mindful of the injunction laid down by the Court of Appeals in the case of *Bush Term. Co.* v. *City of New York* (282 N. Y. 306, *supra*) when it said at page 316: " Of course, the power to construct terminals which incidentally contain ' storage space and space for other facilities ' might be transcended if, under cover of that power, the Port Authority assumed to construct an office or loft building intended primarily for revenue and only incidentally for terminal purposes."

It seems that this statute would give the Port Authority the right to do exactly what the Court of Appeals says it has no right to do. It would permit the use of the property " primarily for revenue ". It permits the use of areas that may " *not be devoted to purposes of the port development project other than the production of incidental revenue available for the expenses of all or part of the port development project.*" (§ 2.) (Emphasis supplied.) We cannot conceive of how language could have been written more directly contrary to the caveat of the Court of Appeals. Under this grant of power there is no structure of

---

* Another reason for the necessity for passing upon the validity of the act in its entirety at this time, is the stated inability of the Authority to raise funds — in view of the cloud of unconstitutionality — to pay for the tubes project as mandated. The Authority's statement that it has no funds presently with which to finance the tubes project may well lend support to one of the arguments advanced for the defeat of the condemnation proceedings.

any kind that may not be built in the 13-block area, provided such structure produces revenues to support the project. In effect, as written, the statute contemplates the building of structures that will provide the fuel to run the railroad and the means to support the trade center portion of the project. The quoted provision cannot be supported under any theory.

However, the respondents point to the *Bush Terminal* case as authority to support that grant of power. Permitting structures producing incidental revenue to be erected above areas necessary for public use is quite different from permitting condemnation of other areas not needed for the public purpose, but merely to provide funds to support the public project.

We might add that there is nothing in the statute which limits the area which the Port Authority might use for this revenue producing purpose. While it might not do so, what is to prevent it, if it so chooses, and acting within the powers conferred by this statute, from using nine-tenths of the 13 blocks for revenue producing purposes and but one-tenth for public purposes? If it did so it would be acting well within the power conferred by the statute. The very magnitude of the permissible taking lends credence to the possibility of the Authority using a greater portion for revenue producing purposes than for public purposes.

We point to another instance where the powers granted by the statute are so broad as to mandate a finding of unconstitutionality. The Legislature authorized the Authority to construct such buildings as custom houses, custom stores, foreign trade zones and like facilities — all clearly public purposes — but failed to limit such authorization to that type of building. On the contrary, it expressly permitted the Port Authority to erect buildings and use warehouses for functions "incidental to * * * the exchange, buying, selling * * * of commodities and other property in world trade and commerce "(§ 2). Exercising this power would indeed make this project, in reality, what the appellants call a real estate development. It is so broad that it is difficult to think of any enterprise, or any business in the City of New York, which could not find a home within the condemned area, although devoted exclusively to private purposes. Nor is it even required that the business be of such a nature as to be considered, in legal contemplation, foreign commerce. Every retailer who has foreign goods for sale; every shipper who handles imported merchandise; every trucker who transports foreign goods or goods destined for the foreign market; every manufacturer of goods for export, and countless others would appear to be eligible for space in the trade center.

There are very few, if any, commercial buildings within the City of New York that do not house enterprises of the nature contemplated.

We do not say that the State, or the Port Authority through delegated powers, may not take private property to be developed by private interests if the underlying object is for a public purpose (*Cannata* v. *City of New York*, 11 N Y 2d 210). However, to permit private interests to use condemned land for private purposes solely to produce revenue for the maintenance of a public project is, as we have indicated, expressly prohibited (*Bush Term. Co.* v. *City of New York*, 282 N. Y. 306, 316, *supra*). That is exactly what this statute does. The frequent use of the word " incidental " does not dam the flood of private enterprise that could submerge the public purpose contemplated. The public purpose contemplated may constitute but an island in the sea of private use.

Is it possible for us to excise these powers which we consider to be in excess of the Legislature's power to grant? What would be left of the trade center concept if we were to do so? Would the project then be feasible? Would the grant of power to condemn 13 square blocks be essential? It would seem that if we were to excise the objectionable portions of the statute we would be excising portions without which the Legislature would not have authorized the creation of the trade center. It would be an invasion of the legislative function to allow the residue of the statute to remain. It perhaps would be writing a statute that the Legislature never would have written. That we may not do.

In the circumstances we find that portion of the act which permits of the creation of a world trade center to be unconstitutional. In consequence, and because of the unification provision, the Authority may not go forward with the condemnation proceeding in connection with the tube project.

In the light of this finding we deem it unnecessary to consider the other points raised in support of the position that the act is invalid. Accordingly, the orders under review must be reversed, on the law, with costs. A temporary injunction restraining the condemnation of the tube and tube properties should issue; the Port Authority may not be permitted to condemn or be given possession of the properties involved, and the cross motion of the respondents to dismiss the condemnation proceedings should be granted. Settle order.

STEUER, J. (concurring). I concur in both the reasoning and result set out in Judge RABIN's opinion. In furtherance of the same the singular attitude taken by the Port Authority is worthy

of consideration. The Authority contends that, in connection with the constitutionality of that portion of the statute which deals with the world trade center, it is not necessary at this time to consider anything beyond the concept of a world trade center. If the creation of such a center is a purpose not prohibited by the Constitution, it argues that the particular activities can be subjected to the test of constitutionality at some later time. To bolster this contention, the Authority asserts that it has no present plans in regard to the area and that the same must necessarily await negotiations with the Federal Government in regard to space for a customs house and other facilities, and that there is no present assurance of the extent to which the project will materialize, or that it will at all. Giving full credit to this argument, it follows that if the Authority finds the plan to be unfeasible due to lack of enthusiasm on the part of the Federal authorities or otherwise, it can abandon the project. It thereby does what it rightly says the courts cannot do—it makes the statute severable in the particular respect in which it is not severable and, by inaction, nullifies the legislative intent. This comes about by its present taking of the Hudson Tubes and its failure to proceed with the world trade center.

The foregoing interpretation by the Authority might not be particularly significant were it not for the fact, established in the majority opinion and nowhere contested, that now is the only time that an effectual determination can be made. The Authority does not dispute that following a decision upholding the constitutionality of the statute it can, without further application to any court, take the fee and level the buildings or otherwise dispose of them. A subsequent adjudication that the structures erected do not constitute functions permissible either under the statute or the Constitution will not restore the fee or replace the buildings. And if at that stage and in the face of such an adverse decision the Authority decides that further development would be impractical, the present owners would have lost their property despite the fact that no public purpose was served.

BREITEL, J. (dissenting). The States of New York and New Jersey, by concurrent legislation, have granted to the Port of New York Authority extraordinary powers to assist in an extraordinary task—nothing less than maintenance of the hegemony of the Port of New York in the western hemisphere. The vastness of the concept for such maintenance and the unusualness of the proposed implementation do not suggest constitutional invalidity, although one may require acclimatization.

The so-called "world trade center" concept is simply the development under government aegis of a physical centraliza-

tion of government and private enterprises serving and regulating foreign commerce at a port of entry. To do this, there is required the assembly of land and erection of structures to house and service the many enterprises and their personnel, as well as those who will come to the center to engage in foreign commerce. This, indeed, is nothing more than a great public market or zone, but instead of serving merely a provincial or even urban region, it must serve the needs of traders on the seven seas at the greatest port in this part of the world. As in a public market, it is private enterprisers who will buy and sell wares and services, but the land and the stalls will be provided by a public corporation on a rental basis. Also, as in a public market, there will have to be auxiliary services available to those who work in, use, and trade in the center — from restaurants to automobile parking areas. These should pay their way and provide revenue to the government designated and created sponsor of the center.

Such a center is not a private purpose, but a public purpose, so long as it is reasonably considered essential to the life of the port. It is no more a " real estate project ", as appellants would characterize it, than is a State fair or a municipal public market. Each involves the use of land, structures, the leasing to private enterprisers, and the expectation of revenue from public uses, leasing, and auxiliary services. (See, e.g., *Matter of Cooper*, 28 Hun 515, appeal dismissed 93 N. Y. 507, for authorities cited, involving public markets; *Matter of Mayor*, 135 N. Y. 253, 263, involving piers.)

Thus far, the entire court is in agreement. It is feared, however, that the statutory provisions conferring powers on the Port Authority do not confine it to public purposes.

The answer must be found in one paragraph of the statute in which the definitions are found (L. 1962, ch. 209, § 2; McKinney's Unconsol. Laws, § 6602). This is because all the implementing sections of the statute, including that which provides for eminent domain, are related only to the general purposes of the project (*ibid.*, § 14; § 6614).

The key definitional paragraph reads: " ' World trade center ' shall mean that portion of the port development project constituting a facility of commerce consisting of one or more buildings, structures, improvements and areas necessary, convenient or desirable in the opinion of the port authority for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons, the exchange, buying, selling and transportation of commodities and other property in world trade and commerce, the promotion and protection of such trade and commerce, governmental services

related to the foregoing and other governmental services, including but not limited to custom houses, customs stores, inspection and appraisal facilities, foreign trade zones, terminal and transportation facilities, parking areas, commodity and security exchanges, offices, storage, warehouse, marketing and exhibition facilities and other facilities and accommodations for persons and property and, in the case of buildings, structures, improvements and areas in which such accommodation is afforded, shall include all of such buildings, structures, improvements and areas other than portions devoted primarily to railroad functions, activities or services or to functions, activities or services for railroad passengers, notwithstanding that other portions of such buildings, structures, improvements and areas may not be devoted to purposes of the port development project other than the production of incidental revenue available for the expenses of all or part of the port development project.''

It is immediately evident that this one-sentence definition was inspired with the drafting caution which requires synonyms, nuance word variations, provisos to the third degree, and other impedimenta, to make sure that nothing essential is omitted. This, of course, has the effect of obscuring the otherwise simple structure of the definition, and, what is worse, may suggest that potent clauses are hidden in the thickets.

It is only because of this provision that the majority holds that the statute must be struck down as unconstitutional. In light of the nature of the attack on this provision there is no alternative to parsing it out.

The center is described as a commercial facility. It, therefore, requires space and buildings. Its purpose is then stated to be the centralized accommodation of those involved in world trade, that is, foreign commerce. Included in the listing of accommodations to be provided are offices and even security and commodity exchanges, but all of this listing follows and is circumscribed by reference to the principal purpose of accommodating centrally those engaged in world trade.

Finally, after excluding the railroad properties (the Hudson and Manhattan Tubes project) which are broadly defined elsewhere in the same section, the paragraph permits the use of portions of structures and areas for the ''production of incidental revenue available for the expenses of all or part of the port development project.'' But this follows only after it is forbidden to use the property for other than port development; thus, special emphasis is given to the limitation ''incidental'' in reference to the revenue use of ''portions'' of the structures and areas.

Interestingly, the exact language is found in parallel form in the definition of related railroad property also contained in section 2 of the statute.

The occasion for statutory language authorizing incidental uses and revenues from surplus space and property otherwise held for a public use occurs often enough (e.g., Public Authorities Law, § 1005, subd. 5; cf., id., § 879; L. 1946, ch. 443, § 4; McKinney's Unconsol. Laws, § 6704; see, especially, General Municipal Law, § 72-j, subd. 3).

It is not necessary to range afar. Section 72-j of the General Municipal Law, which authorizes the municipal development of public garages, contains a strikingly relevant provision which has been treated in the courts. Subdivision 3 permits disposition of real property taken in condemnation under arrangements whereby " the use of such portion of the property for other commercial purposes as may be necessary to provide revenue adequate to permit the operation of the principal portion of the property for public parking garages and public parking space or public off-street loading facilities." This provision, of course, goes much further than the one involved in this case.

In *Denihan Enterprises* v. *O'Dwyer* (277 App. Div. 407, affd. 302 N. Y. 451) an action was brought to restrain the City of New York from condemning land under section 72-j. Among the undisputed facts was that the land was to be taken in order to provide parking facilities, in major part for tenants of the New York Life Insurance Company, owner of the huge apartment building across the street. The garage building was not to exceed two stories in height and the roof was to be covered with four feet of earth and be improved with landscaping. Part of the roof was to be developed as a park. In the Appellate Division it was commented that these terms suggested a purpose to provide a private park and pleasant vista, as well as parking facilities, for the tenants of the apartment house. But most significantly, the life insurance company or other successful bidder for the lease would be permitted to rent 30% of the ground floor and first basement space for commercial purposes not connected with garaging or parking.

With respect to the legal effect of these uses for other than garaging or parking the Appellate Division had this to say (p. 410): " The plaintiff places considerable emphasis upon the fact that the contract permits the lessee to rent 30% of the ground floor and first basement space for commercial purposes not connected with garaging or parking. This gives the lessee the private allocation and disposition of a substantial portion of the building. Something of the kind is contemplated by the

statute, with a view to allowing the more profitable use of some of the space for nongarage purposes to produce an income that will permit lower rates for the garage space than would otherwise be possible. *We do not question the legality of this concept or its proper application*, but think that there may be a question of proper proportion in this case in view of the limited size of the structure and the proportion of the space which is reserved for nongarage and nonpublic purposes." (Emphasis supplied.)

When the case reached the Court of Appeals the court, per FROESSEL, J., said, in sustaining the pleading but holding that a trial was required (pp. 458–459): "Without setting out the detailed allegations of plaintiff's complaint, sufficient facts are alleged purporting to show that the public use here may be only incidental and in large measure subordinate to the private benefit to be conferred on the Company, and not for the purposes authorized by the statute. Of course an incidental private benefit, such as a reasonable proportion of commercial space, is not enough to invalidate a project which has for its primary object a public purpose [citing cases], but the use is not public where the public benefit is only incidental to the private [citing case]. Moreover, the validity of a statute upon one set of facts is immaterial if in its application to another situation it results in invalidity [citing cases]."

The *Denihan* case goes well beyond the requirements here. Under this statute the primary public purpose can never be avoided except by illegal subversion. Moreover, the *Denihan* case is equally significant in recognizing that if there was any invalidity involved it was in the particular action then being proposed rather than in the statute which authorized the action. It is difficult to see how, in the light of the *Denihan* case, the statute here can be criticized.

In short, the Port Authority under its statute may not build to provide "incidental revenue" (a contradictory use of the word incidental in the statutory context), but if building for proper project purposes, it may use portions of such construction for incidental revenue. In case the word "areas" seems to carry a large connotation, the word in earlier portions of the definition is modified by the participle "parking", is contrasted with and is not inclusive of buildings, structures and improvements, and is tied to necessity, convenience or desirability in effecting the centralized accommodation discussed earlier. If the Authority might build only because of "incidental revenue", then, of course, it would be building "primarily for revenue", and such use might not be a public use; but whether such use would be a public use or not, it is not a use permitted by this

statute. Instead, the Authority is restricted to using only portions of structures or areas for incidental revenue.

This brings one to the critical distinction made by the court in *Bush Term. Co.* v. *City of New York* (282 N. Y. 306), namely, construction primarily for revenue as distinguished from deriving revenue incidentally from a project with a public purpose. The case involved tax exemption from local real estate taxes, but the majority seems to rely on it. Nevertheless, it was held that the property in question was entitled to full tax exemption.

Thus, Chief Judge LEHMAN, speaking for the court, said (p. 315): "In this case the evidence clearly establishes that the Legislature contemplated that in constructing inland terminals the Port Authority might erect buildings which would include additional space for rental, from which revenue might be derived and that the Legislature intended to confer upon the Port Authority power to construct such buildings."

It was after making this statement that the court pointed out how the Port Authority might, in violation of the statute under which it was empowered to act, exceed the powers granted to it and how this was different from finding an infirmity in the statute giving it the power (p. 316). The case also gives light on the limiting significance of the phrase " incidental revenue ". Speaking of the claimed tax exemption, the real issue in the case, the Chief Judge said (p. 321): " Property held by an agency of the State is ordinarily immune from taxation only while it is used for a public purpose. Property used primarily to obtain revenue or profit is not held for a public use and is not ordinarily immune from taxation, but property held by a State agency primarily for a public use does not lose immunity because the State agency incidentally derives income from the property. [Citing authorities.] Here the evidence and the findings and conclusions of the court at Special Term establish beyond possibility of successful challenge that the use of the building above the terminal for purposes of revenue is purely incidental to the purpose of the Port Authority to operate a terminal facility at a charge which the consumer can pay. There is here no purpose to make a profit and without the use of the upper stories of the building for revenue the public purpose could not be carried out."

True, the *Bush Term.* case was also concerned with revenue from the public use as distinguished from revenue only from so much of a property as is not directly involved in the public use, but the emphasis was on the revenue derived from the nonpublic use upper stories of the building. Its analysis is particularly helpful in disclosing the restrictive effect of the word

" incidental " and that one must be careful to distinguish authority granted by a statute from an opportunity thereby created to disobey its restrictions or even to violate constitutional limitations.

It is also urged that the reference in the definition to commodities in world trade is so broad that it would be all-inclusive of commodity exchange. Of course, words may be read in different ways, and the devil of literalism can create havoc. But certainly no ordinary or legislative usage would suggest that a retailer who merely imported merchandise is engaged in foreign commerce. Even under the Commerce Clause in the Federal Constitution the Supreme Court has had no difficulty in finding that goods in interstate commerce do come to rest (e.g., *Dalton Adding Mach. Co.* v. *Virginia*, 246 U. S. 498; *Schechter Corp.* v. *United States*, 295 U. S. 495, 542–543).

Some concern has been expressed about " piecemeal " taking of property and how those whose property might be taken would not be in a position to resist the taking, for lack of knowledge of the master plan or assurance that it will be carried out. In the first place, this is a problem in any condemnation. The city may take for a school, abandon the idea, and sell off the property to a private builder. In the second place, it assumes a violation of the statute by the Authority, and that the two States which control the Authority will permit the Authority to transgress with impunity, or that the courts would, when the fact of violation becomes apparent. Lastly, the discussion is irrelevant: the validity of a condemnation is determined by the public purpose it appears to serve now and in the future, and not by what actually happens thereafter.

There is another fact of significance. Insofar as the railroad properties are concerned there is no piecemeal taking. All are being taken in one proceeding. It is only with reference to the world trade center project that there is such a fear. But there is no taking for the world trade center project at this time, nor is there any indication how that taking will be or may be accomplished, namely, in one or more takings. When, if ever, that is projected, it will be time enough to determine the legal effect.

Moreover, the only reason the question is reached is the legislative determination that the two proposals for port development be considered a unified project. The most this requires is that the courts determine that the statutory authority for the world trade center project is not prima facie unconstitutional. The courts can determine no more. And had the Legislature wished, even this would not be required. Moreover, it is the Legislature which has, by this statute, permitted the railroad

project to proceed while the world trade center is still being planned. That is no concern of the court. Hence, if there are separate takings, and if that were relevant, it is only between the two projects, and the Legislature has determined that that is the way it is to be. In this there is surely no constitutional problem since the Legislature could have wholly separated the two to begin with. True, it joined them, but not so much as to require parallel and synchronized development — an impractical device in view of the urgent situation with respect to the bankrupt railroad properties.

Consequently, this statute does not raise the thorny problems envisaged, if only its language is read in entirety and the qualifying restrictions are not ignored. Indeed, this statute does not present the need to call upon all the common presumptions of constitutionality, regularity, and validity of legislative purpose, or the conclusiveness of legislative determinations in the area of policy, once it is agreed that a centralized foreign commerce mart or zone is a valid constitutional purpose for a public agency and is a public use. Indeed, the implementing provisions could contain no less (although perhaps, with simpler syntax) if the purpose is to be fulfilled on the grand scale contemplated.

Accordingly, I dissent and vote to affirm the orders denying the motion for a temporary injunction and granting the applications in the condemnation proceeding.

STEVENS, J., concurs with RABIN, J.; STEUER, J., concurs in opinion in which STEVENS and RABIN, JJ., concur; BREITEL, J., dissents in opinion in which BOTEIN, P. J., concurs.

Orders, entered on July 26, 1962 and July 17, 1962 reversed, on the law, with $20 costs and disbursements to the appellants. A temporary injunction restraining the condemnation of the tube and tube properties should issue; the Port Authority may not be permitted to condemn or be given possession of the properties involved, and the cross motion of the petitioners to dismiss the condemnation proceedings granted.

Settle order on notice.