248 Miss. 4 (1963)
156 So.2d 572
PEARL RIVER VALLEY WATER SUPPLY DISTRICT
v.
BROWN, et al.
No. 42886.
Supreme Court of Mississippi.
October 7, 1963.
*7 Watkins, Pyle, Edwards & Ludlam, Robert H. Weaver, Jackson, for appellant and cross-appellee.
*8 J.P. Coleman, W.D. Coleman, Ackerman; Lee, Moore & Countiss, Jackson, for appellees.
*10 GILLESPIE, J.
The appellant, Pearl River Valley Water Supply District (herein sometimes called District), filed suit to condemn 34.3 acres of land located in Madison County. The land was sought by the District for the purposes hereinafter mentioned in connection with the construction and development of a reservoir and related facilities in accordance with the authority granted the District by Chapter 197, Miss. Laws 1958. The owner of said lands, J. Leland Brown, and his wife, Mrs. Amie Brown, were made defendants in the condemnation suit.
In due time and before the condemnation suit was tried, appellees filed in Circuit Court a petition for a writ of prohibition. In this petition reference was made to the condemnation suit which was then pending in the special court of eminent domain in Madison County. The petition and the answer thereto raised the issues hereinafter stated and discussed. The petition sought and the court granted a temporary writ of prohibition pending final hearing.
Upon conclusion of the hearing on the merits, the Circuit Court found that 7.6 acres of appellees' land *11 should be turned over by the District to the Natchez Trace Parkway for the relocation of the parkway; 2.10 acres was below contour 296 above sea level and would be permanently inundated; 5.4 acres was between contour 296 and contour 300 and would be subject to occasional inundation; and the remaining 19.3 acres was above contour 300 above sea level. All of said land is within one-quarter mile of contour 300 feet above sea level. The Court dissolved the temporary writ of injunction as to all of said lands to be used for relocation of the Natchez Trace and that below contour 300 above sea level, and made the writ permanent as to the remaining 19.3 acres. The District appealed directly from that part of the judgment of the Circuit Court making the writ of prohibition final as to 19.3 acres. J. Leland Brown and his wife cross-appealed from that part of the judgment vacating the temporary writ of prohibition and declining to make final said writ as to said lands in excess of 19.3 acres.
In his opinion the Circuit Judge referred to the provisions of the Act creating the District providing that a person actually living on the land shall have certain rights of repurchase and stated that "... due to the fact that the provision is in the statute, it is my opinion that public necessity should be clearly and without doubt shown before a person's homestead may be taken." The Circuit Judge then concluded that there was no public necessity for the taking of the 19.3 acres.
The minutes of the Board of Directors of the District declaring the necessity for the condemnation of appellees' land was made Exhibit B to the application in the eminent domain suit and was set forth in the answer to the petition for a writ of prohibition, being as follows:
"WHEREAS, this Board does now find and determine that most of the lands more particularly described in Exhibit `A', attached hereto and made a part hereof, *12 is located below the 300 foot above sea level contour and will be inundated either permanently or periodically; that the remainder of said described lands are located within one-quarter (1/4) mile from the outside line of the 300 foot above sea level contour on each side of Pearl River; that all of said lands are necessary for the construction, operation and maintenance of said Reservoir, for the recreational development of the shoreline, to provide access to the Reservoir and its shoreline, for the control of the Reservoir and the protection of its waters from pollution, and such other uses as are authorized by law, as specified in the said Resolution of this Board captioned `General Policies of Land Acquisition'; that the only interchange connecting the Natchez Trace Parkway with the Pearl River Reservoir is located immediately adjacent and contiguous to said lands; that part of said lands are required for the relocation of the Natchez Trace Parkway itself; that many persons will come from the Natchez Trace Parkway and will need public access and public accommodations here; that in addition to Natchez Trace Parkway traffic, Highway 43 serves a tremendous and populated area requiring public access and public accommodations; that a public park and public facilities such as boat launching facilities, picnic facilities, restaurant facilities and motel facilities will be required on said lands; that a portion of these lands are needed for a wildlife sanctuary to be prepared by the District;" ... .
The entire land involved in this controversy consisting of 34.3 acres has been occupied by appellee and his family for ten years, but title was not acquired by appellee until 1960. It is located in the north and east of the intersection of Mississippi State Highway 43 and the Natchez Trace Parkway. The said intersection is located on the west side of the proposed 30,000 acre reservoir. This intersection is about ten miles north of the west end of the dam which is located near a *13 Natchez Trace Parkway interchange by means of which traffic can leave the Natchez Trace Parkway and go to the dam. There is to be no other interchange going north on the Natchez Trace Parkway between the dam and the interchange at Highway 43. There will be an additional interchange about eight miles north of the Highway 43 interchange. Between the interchange near the dam and the interchange at the intersection with Highway 43, there will be three underpasses where local traffic can go under the Natchez Trace Parkway to reach certain areas of shore property lying between the Natchez Trace Parkway and the reservoir. For most of the distance the Natchez Trace Parkway, between the interchange at the dam and the interchange at Highway 43, runs close to the water line and there is no land between contour 300 and the Natchez Trace exceeding about ten feet in width. So for practical purposes, the western boundary of a large part of said ten-mile strip will be the Natchez Trace Parkway.
After the reservoir is filled there will be only 161 acres of land in the area of the intersection of the Natchez Trace Parkway and Highway 43 above contour 300. Ninety-seven acres of this land has already been acquired by the District and the remaining part is involved in this and other litigation.
The engineer for the District, the president of the District Board, and the State Health Officer, who is also a member of the District Board, all testified. Extensive inquiries were made concerning the public needs of other reservoirs similar to the proposed Pearl River Reservoir, and the witnesses visited and studied thirteen other such projects. Based on these studies, including the actual statistical data from the experiences of other reservoirs, it was estimated that when the District completes and fills the reservoir it will be visited by approximately 2,630,000 people annually, with a daily average of 7,200, and on peak days, 46,000. The public *14 will require 67 ramps for launching boats, 41 picnic areas, 10 swimming beaches, 414 tent spaces, 104 guest rental units, 5 restaurants, and 6 organizational camps. It was estimated by the witnesses that 22-1/2% of the visitors to the entire reservoir will use the area at the intersection of Highway 43 and the Natchez Trace Parkway, and the same percentage of the said facilities will be needed by the public in that area, that is, on the 161 acres of land between contour 300 and the Natchez Trace Parkway, including the land of appellee, J. Leland Brown. The number of visitors will nearly triple in ten years after completion of the reservoir. Said witnesses testified that the acquisition by the District of the land in question was imperative in order to control access to the reservoir and to control pollution, and that if the District did not own and control this piece of land it would frustrate the whole project, and they were of the opinion that the entire 161 available acres in the intersection area was insufficient for the needs of the District.
All of said witnesses were of the opinion that the District needed a minimum of 660 feet above contour 300 above sea level around the entire perimeter of the reservoir in order to adequately control pollution and access to the reservoir. It was shown by these witnesses that facilities such as swimming beaches, community houses, rental units for overnight visitors, gasoline stations, restaurants, boat launching facilities, parking areas, and like facilities are customarily provided at public reservoirs. These witnesses also stated that the City of Jackson is now paying $500,000 annually to the District for water and that the continuance of this payment depended on the District furnishing the City of Jackson a supply of pure water. They were of the opinion that pollution control could not be accomplished by exercise of the zoning powers, but that it was imperative to own the land so that any lease *15 made thereof could provide for control. Because so many people would use the Natchez Trace-Highway 43 area, it would be necessary to control the collection and disposal of all wasts so as not to pollute the water.
The plans are not final as to the exact use to be made of each part of appellees' land, except that it will all be needed for pollution control and for access control. All of said witnesses testified that it would be needed for various park and recreational purposes including those mentioned. The engineer and president testified that final plans for use of appellees' land could not be made until the District determined what land would be available to the District.
A former engineer for the District testified for appellees and he thought pollution control for this large reservoir was ridiculous, but he admitted that the Natchez Trace-Highway 43 area was a "hot spot" and it was needed by the District for recreational purposes. He thought appellees should be allowed to keep their land because of the homestead provisions of the law, and while he was engineer for the District he gerrymandered the boundaries in order to let the Browns keep their land.
A member of the Board of the District testified for appellees and stated that until overall plans for the reservoir are completed it cannot be said that any particular piece of land is necessary.
A former member of the Board of the District testified for appellees and said that he did not consider the taking of appellees' land necessary, but that it was desirable. He stated that he realized "the need to control the shorline, just how far from the shoreline has never been clear in my mind, why the Board wanted to acquire so much of that property beyond the water's edge."
This Court passed on the constitutionality of the Act authorizing the creation of the District in Culley v. Pearl River Industrial Commission, 234 Miss. 783, 108 So.2d *16 390, and in that opinion sets out the essential provisions of the Act.

I.
The first question presented by this appeal is whether proposed use of the land involved in this suit is a public use.
(Hn 1) The petition denied and the answer affirmed that the use to be made of appellees' land was a public use. When that issue is made, it must affirmatively appear that the use is public, else the writ of prohibition must issue. The burden of proof is on the condemnor on this issue. Section 17, Constitution of Mississippi, makes the question whether the land taken is for a public use a judicial question. Section 17 follows:
"Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for use alleged to be public, the question whether the contemplated use by public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public."
(Hn 2) Appellant contends that the question of public use was determined in the Culley case and that appellees are bound by that decision under the doctrine of res judicata. We hold that the Culley case did not bind the individual landowners under the doctrine of res judicata. What that case held, for the purposes of determining the constitutionality of the Act, insofar as the public use question is concerned, was that the uses authorized by the Act of the quarter-mile perimeter area were public uses, and to that extent that case is binding as precedent under the doctrine of stare decisis. Since the proof in the present case shows that the land sought to be condemned is for use by appellant in fulfilling its public purposes, this Court is bound by the Culley case *17 on the question of public use. In that case, we held, among other things, that use of land within the quarter-mile perimeter area for pollution control, control of access to the reservoir, for parks and recreation facilities, would be public use of such land. That part of appellees' land to be used for relocating the Natchez Trace and that part which will be below contour 300 feet above sea level involve uses so obviously public that discussion thereof is unnecessary.
(Hn 3) The resolution adopted by appellant declaring the appellees' land to be necessary for public use stated the purposes to be for control of access and pollution control, as already mentioned. It also stated that part of said lands would be used for facilities for public use, including a public park, facilities for launching boats, picnic areas, restaurants, motels, and wildlife sanctuary. It is contended by appellees that these are private purposes; and to permit the taking of said land would be contrary to Section 17 of the Constitution of Mississippi in that it would be taking private lands for private purposes. They also argue that the leasing of said lands for such purposes would not be for a public purpose. There are two reasons why this argument is not valid.
First, all of the proposed uses are those customarily provided for the public at such recreational reservoirs. The proof so showed without dispute. These facts we also know as a matter of common knowledge. When people visit a recreational area and stay overnight or for several days or more, obviously they need a cabin or motel room in which to sleep. They need places to launch and protect their boats, to purchase gasoline for boats and automobiles, to park automobiles, to camp, to congregate, to eat, to swim, have picnics, and other facilities for their enjoyment and comfort. These facilities must necessarily be near the water, else the appellant cannot provide the recreation contemplated by the legislature. Therefore, we hold that all of such incidental *18 uses are public uses. If the appellant provides these facilities by leasing a part of the subject lands to private individuals or corporations with appropriate provisions in the lease to assure pollution control and access control, and to assure that the lessee will provide the public facilities, such leasing will not detract from the public use of said lands. This we held in the Culley case, following Albritton v. City of Winona, 181 Miss. 75, 178 So. 799. The establishment of parks and facilities in furtherance of recreation in connection with the reservoir is a public use. 2 Nichols, Eminent Domain, 3rd Ed. (1950), Sec. 7.5151.
In the second place, the land in question is to be used for pollution control and control of access. That alone justifies the taking insofar as the question of public use is concerned. The "... . taking is not invalid merely because an incidental benefit will inure to private individuals." 2 Nichols, Eminent Domain, 3rd Ed. (1950), Sec. 7.222. And in the Culley case we said: "The conditional or discretionary power in a district to later lease or sell the property is only a minor incident to the general public purpose of the Act."
It seems obvious to this Court that if the District is to fulfill the public purposes stated in the Act, it must own the perimeter lands for control of access to the waters of the reservoir, and in order to control pollution, perhaps the most important factor in carrying out the public purposes of the Act.
(Hn 4) We have carefully considered the numerous cases relied upon by appellees and fail to find them applicable. Peavy Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483 (1928), is not in point on the facts. Courtesy Sandwich Shop, Inc. v. Port of New York Authority, 237 N.Y.S.2d 820 (1963), is not in point. In that case land was sought to be condemned which was not to be used for any public purpose. But the Court recognized that when land is taken for a *19 public purpose which is primary and paramount, the taking will not be defeated by the fact that incidentally a private use or benefit will result which would not of itself warrant the exercise of the power. Applying that case here, it would follow that if the primary purpose of the proposed taking is private, the taking is unlawful. On the other hand, if the primary and paramount purpose of the taking is for public use, as in the case at bar, it will not be defeated because some incidental private benefit or use results. That is what the New York Court held, and that is the effect of the Culley case. That same rule applies to the present case.
Appellees earnestly and vigorously contend that the taking of their land constitutes a sin against private property and that the use of the power of eminent domain in this case would amount to a liberal application of the power of eminent domain, and cite cases holding that such power must be strictly construed. The appellees take specific uses such as "restaurants" and proceeds to argue that the restaurant business is private and the District has no right to condemn private property for such private use. If a restaurant or other such facility was all that was involved, appellees would be correct. The fallacy of this part of appellees' argument is the isolation of specific matters from the context of the public purposes involved. The primary and paramount purpose and use is not for a restaurant or other incidental facility. As far as appellees' land is concerned there are three primary public uses: Control of pollution, control of access to the reservoir, and to provide recreation. All of these uses pertain to the reservoir, and to contend that these uses are not public is to contend that the reservoir itself is not a public use of the lands covered thereby. There are numerous public parks, buildings, reservoirs, college campuses, schools, courthouses, airports, seaports, and office buildings, the public use and enjoyment of which require more than the primary *20 use. Parking lots, rest rooms, community houses, swimming pools, rental cottages in parks, restaurant facilities, and service stations, are frequently either furnished by a governmental unit or land is leased to private persons or firms to provide the needed incidental facility. We take notice of these facts as matters of common knowledge and current history. These uses are mere incidents to the primary and paramount public uses, but are nevertheless essential uses in connection with the primary public uses. It could not be seriously argued, for instance, that land could not be condemned for an airport because space would be leased private persons or firms for the operation of a restaurant. There is just as much public reason for a restaurant where people gather to use a reservoir for recreational purposes as there is for a restaurant at an airport.

II.
The second question for our decision is whether there is public necessity for the taking of appellees' land.
(Hn 5) We have heretofore stated clearly and without equivocation that the question of public use is always a judicial question and that it is made so by Section 17 of our Constitution. Our authorities are equally clear that whether there is a public necessity for a taking is essentially a legislative question. (Hn 6) The burden of proof on this issue is on the landowner who seeks to show lack of necessity, (Hn 7) and the rule is that as to whether the taking is necessary is within the discretion of the condemnor, and the courts will interfere with the exercise of such discretion only when abuse of discretion or fraud is shown. This rule was stated in the Culley case, which followed Ham v. Board of Levee Commissioners, 83 Miss. 534, 35 So. 943 (1903), and City of Greenwood v. Gwin, 153 Miss. 517, 121 So. 160 (1929). See also Erwin v. Mississippi State Highway Commission, *21 213 Miss. 885, 58 So.2d 52 (1952). There is no authority in this State to the contrary.
(Hn 8) This record is devoid of any proof or showing of any kind that the appellant abused its discretion in seeking to condemn appellees' land. No fraud, actual or legal, was shown. (Hn 9) On the contrary, while the burden of proof on this issue was on the appellees, the appellant showed by overwhelming proof that the land in question is necessary for the public uses mentioned. The trial court erred as a matter of law in requiring the appellant to show public necessity "clearly and without doubt." This is not the test on the question of public necessity, for the burden of proof is not on the appellant in this case, and the test is not whether public necessity was shown clearly and without doubt. This error arose because the Circuit Judge erroneously applied the homestead provisions of the Act as requiring public necessity to be shown clearly and without doubt.
Section 11, Chapter 197, Laws of 1958, provides in part as follows:
"(w) When in the opinion of the Board of Directors as shown by resolution duly passed, it shall not be necessary to the carrying on of the business of the District that the District own any lands acquired, then the Board shall advertise such lands for sale to the highest and best bidder for cash, and shall receive and publicly open the bids thereon. The Board shall, by resolution, determine the highest and best bid submitted for such land, and shall thereupon notify the former owner, his heirs or devisees, by registered mail, of the land to be sold and the highest and best bid received therefor, and such former owner, or his heirs or devisees, shall have the exclusive right at his or their option for a period of thirty (30) days in which to meet such highest and best bid and to purchase said property."
"(x) Any bona fide, resident householder, actually living or maintaining a residence on land taken by the *22 District by condemnation shall have the right to repurchase not exceeding forty (40) acres of his former land or other available land from the Board of Directors for a price not exceeding the price paid for condemning his land."
The provisions of subsection (x) give a householder actually living on the lands the right to repurchase under limited circumstances not exceeding forty acres of his former land or other available land at a price not exceeding that paid for condemning his land. When read with subsection (w), this refers to land determined by the District and shown by resolution as not necessary to the carrying on of the business of the District. The householder is given more advantage than a mere owner as to price, but limits the amount in any event to forty acres. The right to repurchase does not arise until land has been declared surplus by the District. The repurchase provision has no bearing on the right of the District to condemn land.

III.
The third question for decision is whether the resolution of the Board of Directors of appellant is sufficient.
Appellees argue that the resolution declaring the necessity for the taking of appellees' land should have shown specifically what each part of appellees' land is to be used for, and that the failure of the resolution and the proof in this regard renders the taking unlawful. They argue that unless they are advised the specific uses of every part of their land, it is not possible to determine whether the uses are public or private; and that the failure to show such specific uses makes it impossible for the courts to apply Section 17 of the Constitution in this case.
(Hn 10) The resolution is copied in another part of this opinion. It shows the uses to be made of appellees' land but neither the resolution nor the proof showed any final plans indicating specifically what use is to *23 be made of particular parts of appellees' land. We are of the opinion that appellees' argument is not well taken. The proof showed that all of said land would be used for pollution control and control of access to the reservoir. As already stated, that alone is sufficient to meet the requirements of the law on the question of public use. In addition, all the other uses such as for parks and recreational facilities are also public uses. It is unreasonable and unnecessary to require the condemnor for such public uses to include in the resolution and show by proof final plans for every part of the land taken. Such a rigid requirement would imply that no change could ever be made in the various public uses as time and circumstances might require. It would also imply that no change in plans or use could ever be made. So long as public use is shown, detailed plans are not required.
We are of the opinion, and so hold, that there exists no legal or factual basis for the issuance of a writ of prohibition in this case. On direct appeal the case is reversed, the writ of prohibition is dissolved, and judgment is entered here dismissing the petition. The case is affirmed on cross-appeal.
Reversed and rendered on direct appeal; affirmed on cross-appeal.
All Justices concur, except McGehee, C.J., who took no part.

ON MOTION
GILLESPIE, J.
Appellees filed a motion to assess the costs in this case against the appellant.
The appellant, Pearl River Valley Water Supply District, filed condemnation proceedings against J. Leland Brown and Mrs. Amie Brown, landowners, to condemn certain lands for use by the District. The landowners applied to the circuit court for a writ of prohibition and upon final hearing a permanent writ of prohibition was *24 granted prohibiting the eminent domain court from proceeding with the condemnation of the land. The District appealed to this Court and the judgment of the circuit court was reversed and the writ of prohibition vacated. 156 So.2d 572.
The opinion made no reference to court costs, but the judgment taxed the costs against J. Leland Brown and Mrs. Amie Brown, appellees, the unsuccessful parties.
Sec. 1579, Miss. Code of 1942, is included in Chap. 4, Title 10 of the Code, the subject of which is "Costs." Sec. 1579 is as follows:
"1579. Successful party to recover costs generally. In all civil actions, the party in whose favor judgment shall be given, and in case of nonsuit, dismission or discontinuance, the defendant shall be entitled to full costs, except when it may be otherwise directed by law; and the law of costs shall not be interpreted as penal."
Chap. 3, Title 12, Miss. Code of 1942, includes the statutes on eminent domain, Secs. 2749-2782. Sec. 2767, Code of 1942, covers costs in eminent domain proceedings and is as follows:
"2767. Costs.  The costs in all cases under this chapter shall be paid by the applicant; but in case of appeal by the owner, if the amount awarded in the circuit court do not exceed that found in the special court, the owner and his sureties shall pay the costs incident to the appeal."
Sec. 2782, included in the chapter on eminent domain, provides that the legal remedy by way of prohibition is made applicable for the purpose of testing the questions, (1) whether the applicant seeking to exercise the right of eminent domain is entitled to the right, or (2) whether there is public necessity for the taking of the particular property proposed to be condemned. This suit was instituted by appellees as landowners by virtue of, but not under, the provisions of Sec. 2782, Code of *25 1942. However, there are no provisions in the chapter on eminent domain governing writs of prohibition except Sec. 2782, Code of 1942, which makes prohibition available for the purposes stated.
(Hn 11) The question for decision is whether this proceeding, involving the application for a writ of prohibition, is a case under the chapter on eminent domain and thereby is goverened by Sec. 2767, Code of 1942. Under the general section on costs, Sec. 1579, Code of 1942, appellees must pay the costs as the unsuccessful party, unless Sec. 2767, Code of 1942, applies. Sec. 2767 applies only to costs "in all cases under this chapter ..." The suit involved in this appeal was one for a writ of prohibition, not a suit in eminent domain. The writ of prohibition is a common law writ partly governed by Chap. 1, Title 9, Code of 1942, Secs. 1109-1119. There is no indication that the legislature intended that the provisions of Sec. 2767 be applied except in cases involving the condemnation of land under the eminent domain chapter of the Code. The application by the landowner in this case for a writ of prohibition was not a proceeding in eminent domain but an effort on the part of the landowner to avoid proceedings in eminent domain.
The statute requires that the costs in this case be taxed against the unsuccessful party, the appellees.
Motion overruled.
All Justices concur, except McGehee, C.J. and Kyle, J., who did not participate.