195 So.2d 488 (1967)
Joyce PAULK, Petitioner-Appellant,
v.
HOUSING AUTHORITY OF the CITY OF TUPELO, Respondent-Appellee.
No. 44226.
Supreme Court of Mississippi.
February 20, 1967.
*489 John P. Fox, Houston, L.G. Fant, Jr., Holly Springs, for appellant.
Lumpkin, Holland & Ray, Tupelo, for appellee.
PATTERSON, Justice:
This is an appeal from a judgment of the Circuit Court of Lee County which dissolved a temporary writ of prohibition. This writ was directed to a condemnation proceeding.
We are concerned here with two lots located in a section commonly known as "Shakerag," which is part of an urban renewal project area near the central business district of Tupelo. The Housing Authority of Tupelo was authorized to exercise for that city the urban renewal project powers set out in this state's "Urban Renewal Law." Mississippi Code Annotated sections 7342-01 to 7342-20 (Supp. 1964); and by resolution of August 5, 1958, certain territory in Tupelo, including "Shakerag," was designated an urban renewal project.
On June 20, 1961, the Housing Authority approved an urban renewal plan, further designating the project area in which are located appellant's lots hereinafter called Parcels 1 and 2. Under the plan the Housing Authority was to acquire and redevelop 34.9 acres of land which "includes 7.5 acres of streets and alleys, 20.1 acres of residential (and related uses land) 8.2 acres of commercial land, and 2.9 acres of open or unimproved land."
It is not disputed that at the time the plan was adopted the area in question was a blighted or slum area.
The events and dates leading to this appeal are as follows:
In March of 1963 the Housing Authority filed condemnation proceedings against appellant's land. Shortly thereafter, and before a final judgment in the case, appellant removed or tore down a barn and an outdoor toilet from Parcel No. 2. Following the judgment rendered in September of 1963 in favor of the appellee, a dwelling was removed from Parcel No. 1 by the Housing Authority.
In June of 1964 the September 1963 judgment was declared null and void because of a defect in the proceeding of the court of eminent domain.
When condemnation proceedings were initiated again on April 20, 1965, the lots of appellant were vacant. In its application to condemn Parcels No. 1 and No. 2 the Housing Authority stated that the lands were to be taken by virtue of resolutions adopted January 2, 1940 (setting up the Housing Authority) and August 5, 1958 (authorizing the Housing Authority to exercise urban renewal powers).
Thereafter, a temporary writ of prohibition was issued for appellant and on a motion to make the writ permanent, the circuit court dissolved the writ and dismissed appellant's petition.
Appellant bases his appeal on the following propositions:
1. The land is not being acquired for public use because it will be sold later by the Housing Authority to private persons for redevelopment for private use and as such violates due process under the Constitution.
2. There is no necessity for taking the land because it is clear, open, and free of slum or blight conditions; and appellant is willing to cooperate with the *490 Housing Authority in carrying out the purposes of the urban renewal plan.
3. The Tupelo Housing Authority in 1965 had no power to condemn appellant's land.
This Court has said that the question of public use is always a judicial question, and that the question of public necessity is essentially a legislative question. Pearl River Valley Water Supply Dist. v. Brown, 248 Miss. 4, 156 So.2d 572, 158 So.2d 694 (1963).

I.
Here a governmental agency has condemned land and is attempting to acquire it for the stated public purpose of urban renewal.
Government has the right to take private land for public use upon just compensation. This right is granted to the state government and to designated public agencies by the State Constitution and statutes. In this instance the Housing Authority has selected as a method of renewal and redevelopment the reselling of the land to private persons, subject to restrictions designed to prevent a recurrence of slums.
Appellant contends this is not a taking for public use, but a governmental exercise of power by which one private owner is deprived of his land and another private person is allowed to purchase the land for private use.
In the Brown case it was decided that where the incidental power to lease land to a private individual or corporation is connected with a paramount public use, the fact that some of the land to be taken is to be thereafter leased does not defeat the power of eminent domain.
This decision was followed in Wright v. Pearl River Valley Water Supply Dist., 250 Miss. 645, 167 So.2d 660 (1964) and Pearl River Valley Water Supply Dist. v. Wood, 248 Miss. 748, 160 So.2d 917 (1964).
Appellant attempts to distinguish the present actions from those cases. There the use of land for lease to private individuals after condemnation was incidental to the paramount public purposes of pollution control, control of access, and providing for recreational facilities. Appellant says there is no such public purpose to be served here. We disagree. The public purpose is urban renewal and slum clearance. This purpose is not necessarily fulfilled when clearance is complete. Here plans for redevelopment are to be carried forward under regulations which will insure against a recurrence of slums in the area.
Neither has the public use ended because appellant's land is now clear. When a blighted area as a whole is subject to redevelopment, the condition of the condemnee's property is immaterial if the property lies within the designated project area and its acquisition is necessary to accomplish the paramount purpose of renewal. Hunter v. Norfolk Redevelopment and Housing Authority, 195 Va. 326, 78 S.E.2d 893 (1953).
A similar argument was made by a department store owner who challenged the constitutionality of a redevelopment project in the District of Columbia. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). There a unanimous court held that Congress may provide for redevelopment of blighted areas through its exercise of eminent domain powers, and it may determine that private enterprise can be used to obtain the object of redevelopment. The owner argued that this made the project a taking from one businessman for the benefit of another businessman. The court declared that it could not say that public ownership was the sole method of promoting the public purposes of community redevelopment projects. "The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts *491 as the price of the taking." 348 U.S. at 36, 75 S.Ct. at 104, 99 L.Ed. at 39.
See, however, Hunter v. Norfolk Redevelopment and Housing Authority, supra, which indicates that two states, Georgia and Florida, have held against such housing authority project because the primary purpose, as there held, was the commercial redevelopment of the area and not slum clearance.
We are of the opinion that appellant's first point is not well taken.

II.
Appellant urges that since the area is now clear there is no necessity for taking his land.
A member of the Tupelo Planning Commission, an advisory body to the city, testified that appellant's property was necessary in carrying out an overall plan for Tupelo which he said was correlated with the urban renewal project.
The renewal project planner testified that a major portion of appellant's land would be used for streets under the urban renewal plan. This testimony was objected to because there was nothing mentioned in the condemnation proceedings about taking the property for streets. As was decided in Pearl River Valley Water Supply Dist. v. Brown, supra, it is not necessary for the condemnor to show final plans for every part of the land taken.
The question of public necessity is determined by a duly authorized governing body in its exercise of legislative powers at the time the need is recognized. This recognition was made in the resolution of the mayor and board of aldermen declaring the necessity for urban renewal for Tupelo on August 5, 1958, and again on June 20, 1961, when the Housing Authority approved an urban renewal plan and declared the necessity for taking certain lands including appellant's land.
The burden of proof on the issue of necessity is on the landowner who seeks to show lack of necessity. Whether the taking is necessary is within the discretion of the condemnor and the courts will interfere with the exercise of such discretion only when abuse of discretion or fraud is shown. Pearl River Valley Water Supply Dist. v. Brown, supra.
There was no proof of abuse of discretion and no allegation or proof of fraud. For this reason we are of the opinion that Point No. 2 as urged by the appellant is not well taken.

III.
Appellant argues that when the eminent domain proceedings were commenced in 1965 there was nothing standing in the project area except grass and trees; and that the statute then in effect contained an express prohibition against the condemnation of "open land." Miss. Code Ann. § 7342-06(d) (Supp. 1964).
The land in question was not "open" when the public necessity for taking was declared by resolution, and the conditions that prevailed at that time are what govern the necessity question.
Appellant argues that there is conflict in the pleadings. The Housing Authority condemnation order of 1965 stated that the land was necessary "for the rehabilitation, conservation and redevelopment of said urban renewal area." The urban renewal plan adopted by the Housing Authority in 1961 expressly excluded any land use for either rehabilitation or conservation. Appellant says this leaves only the term, "redevelopment" in the order for condemnation. Appellee argues, and we agree, that the language of the condemnation order obviously refers to the rehabilitation, conservation and redevelopment of the land, exclusive of structures or improvements, and that the terms rehabilitation and conservation as used in the plan, in the context referred to, *492 have reference only to structures or improvements on the land.
If a conflict does exist between the language of the order and the plan, however, the plan as an exhibit to the order is controlling under established rules of pleadings. See Williams v. Wilson, 241 Miss. 155, 129 So.2d 125 (1961).
We find, therefore, there is necessity for taking appellant's land. Appellee declared the necessity for taking the land. There was no showing of abuse of discretion or fraud in its declaration of necessity. The effect of the urban renewal plan was to spur the appellant to clear his lots so they would not be blight or slum areas. Precisely because of the plan, appellant reacted to fulfill its purposes, but the results of his reaction cannot now be used to provide a defense against the necessity of taking. Necessity is determined at the time of the declaration of necessity and on the basis of the physical facts as they exist at the time, and what occurs thereafter in regard to the land is not controlling.
Appellant's land was taken for a public use. The use did not end when the area was cleared. Under the plan part of the land will be used for streets and other similar public improvements and part will be used for commercial and industrial facilities, the latter to be sold subject to covenants, conditions and restrictions designed to prevent a recurrence of slum conditions. The project area is located near the central business district. Plans for the area are intimately tied in with an overall plan for development of the city of Tupelo and are in the public interest.
The judgment of the lower court is affirmed and the cause is remanded for determination by a court of eminent domain of the amount to be paid appellant for his land.
Affirmed and remanded.
All Justices concur except SMITH and ROBERTSON, JJ., who dissent.
SMITH, Justice (dissenting):
 "Through the open window's space
 Behold, a camel thrust his face.
 `My nose is cold,' he meekly cried,
 `Oh, let me warm it by thy side.'
 * * * * * *
 To evil habit's earliest wile
 lend neither ear, nor glance, nor smile 
 Choke the dark fountain ere it flows,
 Nor e'en admit the camel's nose." The
 Camel's Nose by Lydia Huntley Sigourney
 (1791-1865).
The Camel of government is long since within the tent, making itself at home, behaving very much as if it owned the place.
It is too late, and an exercise in futility, comparable to that undertaken by King Canute, when he forbade the coming in of the ocean tide, to deplore the further invasion by government of the private rights of individuals. (Nevertheless, I respectfully dissent in this case.)
On August 5, 1958, the Mayor and Board of Aldermen of the City of Tupelo adopted a resolution declaring the necessity for urban renewal in that city. On June 20, 1961, the Housing Authority of the City of Tupelo approved an urban renewal plan. This plan provided for the acquisition of a "blighted area," occupied by substandard structures, and other lands necessary to carry out a proposed plan for the clearance and redevelopment of the area. The plan recited that there were no areas to be acquired either for "rehabilitation or conservation." The plan also contemplated some layout of streets, expressly described as "tentative," proposed to be improved or constructed, and "tentative layout of sanitary sewer and water mains," and street lighting.
The plan concluded with a provision that it might be modified at any time by the Mayor and Board of Aldermen of the City of Tupelo.
The property of Joyce Paulk, which is the subject of the present controversy, was *493 included within the designated area. The shape of this area is most irregular, and, as its boundaries are outlined upon some aerial photographs in the record, resembles nothing so much as an elongated sitting duck. It is bisected by the main line of the GM&O Railroad, which runs north and south through it. Paulk's property is located in the area east of the railroad.
Following an abortive attempt in 1963 to acquire Paulk's property (which attempt it is stipulated was absolutely "null and void") the area, including Paulk's property, was cleared of all "substandard structures" and became vacant or open land.
A little more than two years later, in April 1965, the Housing Authority filed a second application for the condemnation of appellant's property, exhibiting a copy of the August 5, 1958 resolution of the Mayor and Board of Aldermen of the City of Tupelo, and a copy of a Tupelo Housing Authority resolution directing the condemnation of the Paulk property, the Housing Authority resolution referring to the 1961 "Urban Renewal Plan." Paulk applied to the Circuit Court of Lee County for a Writ of Prohibition to stay the eminent domain proceedings, and a temporary writ was issued. The circuit court then heard the matter upon Paulk's petition to make the writ permanent. At the conclusion of the hearing, the court entered an order dissolving the writ. It is from that order that this appeal has been prosecuted.
Three questions are posed by the appeal:
(1) In April 1965, when the second eminent domain proceedings were filed, was appellee vested with lawful authority to take Paulk's lands?
(2) Was prejudicial error committed by the trial court in admitting immaterial and prejudicial evidence over appellant's objection?
(3) Was it error to dissolve the writ of prohibition?
In Wise v. Yazoo City, 96 Miss. 507, 51 So. 453, 26 L.R.A.,N.S., 1130 (1910), there appears the following statement:
"No power conferred on any corporation, either private or municipal, is to be more strictly construed than the power to exercise the right of eminent domain. Thus, in 15 Cyc. p. 567, it is said: `The power of eminent domain being in derogation of the common right, acts conferring it are to be strictly construed, and are not to be extended beyond their plain provisions. The right to exercise the power is strictly limited to the purposes specified in the statute conferring it. The proposed use of the lands of the owner must be clearly embraced within the legitimate object of the power conferred. Where there is any doubt in regard to the extent of the power, the landowner must have the benefit of that doubt.'" 96 Miss. at 519, 51 So. at 454-455.
In the case before us, the testimony of the engineer who designed the area, given as a witness for appellee, stated that the public purpose for which it was proposed to take "the major portions" of the Paulk property, "on the southside," was "for streets," and the rest for "commercial use."
Typical of the testimony offered on behalf of appellee to justify the taking is this answer of the design engineer:
"This would put some very strenuous design controls, because you would be designing to this property, the old area to this property, rather than being designed to the best interests of the city, and the project was designed to the best interest of the City, and it would be infeasible without the property."
The overall testimony offered by appellees shows that the taking of the property east of the railroad (where the Paulk property lay) so far as public use was concerned, would not be necessary except, possibly, for streets, that the location of the streets was tentative and might be changed, and *494 that no other public use (except resale to private enterprise) was contemplated by the City of Tupelo, or the Tupelo Housing Authority.
One of the Housing Authority Commissioners, testifying for appellee, frankly admitted that the area east of the railroad was not a slum area when the eminent domain proceedings were filed.
As to the purpose of the taking of the Paulk property, he said:
"Yes, I feel it would be necessary and needed in the plan for new streets, drainage, and new facilities as far as that land might be used and it may be a public facility would traverse part of it in addition to the fact that small parcels may not fit into an orderly redevelopment of the area."
He stated that the Paulk property would be offered for sale to private persons or corporations, unidentified, for their use in conducting private businesses, of an unstated character, and that Paulk himself might buy the land back, if he had the money to do so.
It appears from the testimony, as well as from the pleadings, that the substandard structures were all removed from the area, including the Paulk property, in 1963, and that blighted or slum conditions no longer existed. The map of the project, from which appellee's witnesses testified, was the official map, purporting to show streets, but was said not to represent the final plan and that there would probably be further changes. It was shown that the map or plan had been approved locally, but had not been approved by the U.S. Urban Renewal Administration.
A witness for appellee was asked:
"Q. Now when do you think the plans will reach their final inspection?
A. Well, as soon as the Board's decision on the final design which will be a matter of a few weeks, or maybe two months.
Q. Now the original plan was made in 1961, wasn't it, Mr. Long?
A. Yes, sir, that's right.
Q. Were you connected with the Housing Authority then?
A. Yes, sir.
Q. And when was the next change made in it?
A. I believe that the next change was made last Fall."
And he further testified:
"Q. And if it is approved, do you think it will be the plan approved by the urban renewal authority?
A. I don't think that will be the final plan, in my opinion.
Q. When do you think the final plan will ever be made with reference to time, do you think it will take another one year or five years?
A. I think it will be within the next two months.
Q. Now that has to do with merely adding some additional land to the north side, doesn't it?
A. No.
Q. It does not?
A. No.
Q. You mean to testify that the Urban Renewal Authority is going to review this whole plan that it has had since 1961 and change everything perhaps in there?
A. I didn't say that.
Q. All right, just a moment.
I show you a map marked `Exhibit A' to the testimony of Mr. Brock which says it is dated January 1961, *495 revised June 15, 1961 and is the land use plan.
Is it your testimony that this thing might be entirely changed so you wouldn't recognize it?
A. Not entirely changed.
Q. Well what changes are you talking about?
A. I think that probably some changes will be on the east side of the GM&O Railroad.
Q. On the east side? (Paulk's land is on the east side)
A. Yes, sir, that is probably where the changes will be made.
Q. Do you know what those changes will be?
A. Well, no, sir."
It was further conceded by appellee that the City of Tupelo had adopted zoning ordinances restricting the use of Paulk's land, and other lands in that area privately owned, to the same uses, industrial and commercial, for which it was proposed that it be acquired and sold for use by private enterprise.
The conclusion is inescapable that for some two years or more preceding the filing of the application for the condemnation of Paulk's property, the conditions upon which the resolution for the rehabilitation of the area had been adopted in 1961 had radically and completely changed and were wholly different from those which formed the basis of the original resolution in 1958. The zoning ordinance had effectively restricted the use of the property to that said to be contemplated by the Housing Authority upon its acquisition for resale. It is clear that the plans and map, as to the proposed location of streets, were only tentative, and were in no sense final, but that further changes were contemplated and expected. They had not been approved by the U.S. Urban Renewal Administration, and funds counted upon for financing the project required such approval. At the time of the filing of the eminent domain proceedings, the plan was tentative and the public use to which it was expected to put Paulk's property, as stated by appellee's own witnesses, was nebulous and uncertain.
However, the case was tried as if it were still a blighted area, and in large measure, upon evidence which related only to a slum condition which had ceased to exist some years previously.
It may be conceded that, if public convenience and necessity actually should require the taking of all or any part of Paulk's property for a street, that the City of Tupelo had ample power to take it. Moreover, the same power exists for such a taking if it should be found necessary for use as a site for an industrial enterprise. However, in either case, appropriate resolutions, containing necessary jurisdictional findings and a definitive and specific statement of the public necessity for the taking and the actual public use to which it is proposed that the property shall be put, should be indispensable conditions precedent to the exercise of the power.
The nebulous, vague and speculative suggestions as to what "might" be done with the property, should be rejected as an insufficient basis for the taking of private property.
Based upon the foregoing, and considered in the light of cited authorities holding that the power of eminent domain is to be strictly construed and will not be considered to exist in a municipal authority except as it is clearly granted, a new resolution should have been adopted, if warranted by the actual facts and circumstances, as they existed in 1965.
Moreover, the court erred in admitting and presumably considering, a great mass of testimony, photographs, and other evidence, relating exclusively to slum conditions as they were in the area in the early part of 1963, although such conditions, when *496 the present eminent domain proceedings were begun in 1965, had been radically altered and admittedly had ceased to exist some two years previously.
Approval of the exercise of the power to take private property, under circumstances such as those in the present case, is an invitation to its abuse. Apparently the only limitation upon what property may be taken is the unrestricted discretion of the Housing Authority Commissioners, and the "public use" may be, as here, simply a vague, nebulous and half-formed purpose to resell it, to some person or persons unknown, when, as and if the occasion arises and the commissioners decide that the time is ripe.
Here, for some seven or eight years, since the adoption of the 1958 resolution, which included appellant's property within an area designated for urban renewal, his title has been clouded by the continuing threat of condemnation. It is impossible to imagine that this failed to impair and even destroy its marketability. In itself, this long delay constituted a damaging of private property without compensation.
Analysis of testimony offered by appellee as to the "public purpose" for which it is proposed to acquire Paulk's property shows that, although a part of one lot might possibly be used for a street and although this is not certain, in reality it is the intention of the Housing Authority to take the property in order to resell it; they do not know when, nor to whom, and, while "industrial and commercial" uses are said to be contemplated, there are no such enterprises in sight, and there may never be any.
In other words, they will take the property, hold it until it suits their fancy to sell, and then sell to whomever they choose for such purpose and upon such terms as they may, in the future, decide upon. That is a far cry from condemning property for a specific industrial enterprise.
The clearing up of slum areas is a laudable undertaking. This was accomplished in the present case in early 1963. Without the support of any resolution based upon the actual conditions existing in 1965, some two years later, the Housing Authority sought to condemn Paulk's property upon the authority of the 1958 and 1961 resolutions. Moreover, the case was tried largely upon evidence as to the pre-existing slums, as if there had been no change since 1958. The applicable statute, in effect at the time, contained an express restriction against the condemnation of "open" land. Miss.Code of 1942 § 7342-06(d) (Supp. 1964).
No case is cited where, following the adoption of the resolution, a radical change occurred in the conditions sought to be remedied prior to the institution of the eminent domain proceedings.
The authorities cited, approving the taking of private property for resale for uses adjunctive and necessary to the enjoyment of a recreational area, should not be controlling here. There, the location of the recreational area is fixed by the location of the stream and the limits of the natural watershed. Here, apparently, the extent of the area and the lack of specificity of the public necessity are limited only by the unrestricted discretion of the Housing Authority Commissioners.
There may remain some doubt that government boards and agencies have demonstrated that they may be counted upon to exercise such unexceptionable judgment that it is always to be preferred to that of the private citizen in dealing with his own property.
It follows that appellant's petition to make permanent the writ of prohibition should have been granted.
ROBERTSON, J., concurs in this dissent.