632 So.2d 1284 (1994)
E. Dean MORLEY and Margaret M. Laurence
v.
JACKSON REDEVELOPMENT AUTHORITY.
STANDARD LIFE INSURANCE COMPANY
v.
JACKSON REDEVELOPMENT AUTHORITY, E. Dean Morley and Margaret M. Laurence.
Nos. 90-CA-985, 90-CA-526.
Supreme Court of Mississippi.
February 10, 1994.
*1285 Michael B. Wallace, Phelps Dunbar, Crane D. Kipp, Shell Buford Bufkin Callicutt & Perry, Jackson, for appellant in No. 90-CA-0985.
J. Brad Pigott, Maxey Pigott Wann & Begley, Zachary Taylor, Watkins Ludlam & Stennis, Terryl K. Rushing, Alston Rutherford Tardy & Van Slyke, Michael S. Allred, Allred & Donaldson, Jackson, for appellee in No. 90-CA-0985.
*1286 Michael S. Allred, Allred & Donaldson, Terryl K. Rushing, Alston Rutherford Tardy & Van, Stephen M. Maloney, Allred & Donaldson, Jackson, for appellant in No. 90-CA-0526.
J. Brad Pigott, Maxey Pigott Wann & Begley, Zachary Taylor, Watkins Ludlam & Stennis, Michael B. Wallace, Phelps Dunbar, Dana E. Kelly, Phelps Dunbar, Crane D. Kipp, Shell Buford Bufkin Callicutt & Perry, Jackson, for appellee in No. 90-CA-0526.
En Banc.
SULLIVAN, Justice, for the Court:
The Jackson Redevelopment Authority (JRA) filed this suit to acquire Morley and Laurence's (owners) property on October 23, 1989, in Hinds County Special Court of Eminent Domain. The owners removed the action to the United States District Court for the Southern District of Mississippi, Jackson Division, and filed an answer on December 20, 1989. The District Court remanded to the state court for failure of complete diversity of citizenship among the parties. Standard Life Insurance Company was also joined as a party to the suit, as it claimed an interest in a restrictive covenant on the property. The trial court held that Standard Life had no compensable interest in the property and granted summary judgment against it, but granted Standard Life leave to appeal. The trial court also granted summary judgment for JRA on the question of public use and necessity. After discovery and a number of pretrial motions and hearings on those motions, the case went to trial on April 17, 1990. The jury awarded the owners $500,000 and the owners have appealed, presenting the following issues for discussion by the Court:
I. THE JRA LACKED LEGAL AUTHORITY TO TAKE THE KING EDWARD BY EMINENT DOMAIN;
II. THE SPECIAL COURT IMPROPERLY DENIED THE OWNERS A CONTINUANCE AND IMPOSED IMPROPER CONDITIONS WHEN IT LATER POSTPONED THE TRIAL;
III. THE COURT ERRED BY EXCLUDING ALL REFERENCE TO THE DAVIS APPRAISAL AND THE PROPERTY TAX APPRAISAL, WHILE ADMITTING DESCRIPTIONS OF THE CONTENT OF THE COHEN APPRAISAL;
IV. THE COURT ERRED IN PERMITTING JRA SELECTIVELY TO INTRODUCE EVIDENCE OF STATEMENTS AND CONDUCT CONCERNING THE CONDITION OR VALUE OF THE KING EDWARD, WHILE REFUSING TO PERMIT THE OWNERS TO REBUT SUCH EVIDENCE THROUGH DIRECT TESTIMONY OR THROUGH INTRODUCTION OF EVIDENCE OF SUCH STATEMENTS AND CONDUCT BY JRA AND ITS PRINCIPAL, THE CITY OF JACKSON; and,
V. IF STANDARD LIFE OWNS A VALUABLE INTEREST IN THE KING EDWARD, THEN A REMAND FOR A NEW TRIAL AS TO ALL PARTIES IS NECESSARY.
Standard Life also appealed from the lower court's grant of the JRA's motion for summary judgment, and presents the following issue for discussion:
I. WHETHER A RESTRICTIVE COVENANT IS PROPERTY INTEREST FOR WHICH THE CONDEMNING AUTHORITY MUST PAY IN EMINENT DOMAIN AND, IF SO, WHAT IS THE PROPER MEASURE OF COMPENSATION?

FACTS
The owners purchased the King Edward Hotel property from Standard Life Insurance Company in 1981 for $450,000. The owners had been involved in a number of real estate investments over the years and had a special interest in purchasing historical properties such as the King Edward.
The King Edward Hotel was built in 1923 on a lot of 69,159 square feet in downtown Jackson bounded by West Capitol, Mill and Pearl Streets. The property actually consists of three separate structures. The main hotel tower has 12 floors containing approximately 224,040 square feet of space. Adjacent to the hotel tower is a convention center containing approximately 7,842 square feet *1287 and a three-story parking garage which once housed an automobile dealership. The King Edward is on the National Register of Historic Places due to its excellent architectural design and the fact that for many years it served as the center of social and political activity in Jackson.
The King Edward today is a blight on the Jackson skyline. Last occupied in 1967, the building now is home only to a group of pigeons that enter through the numerous broken windows and mark the hotel with great mounds of disease-carrying excrement. Almost all of the witnesses at the trial agreed that the main tower was structurally sound. An expert engineer called by JRA created the most doubt on the soundness of the structure by testifying that two of the 1300 to 1400 steel columns in the building had been exposed and begun to corrode. He stated that tests would have to be made on more of the columns in order to determine the extent of possible corrosion in other parts of the building frame. The owners' expert architect, however, thought that the only reason those columns were deteriorating was the fact that the roof over both of them had holes in it, allowing moisture to seep into those columns. It was generally agreed also that any renovation of the hotel would require "gutting" the entire building, which meant removing all of the finishing material in the hotel and using only the existing structural frame and the facade of the building. Further measures necessary for a renovation were the addition of another stairwell to meet current building codes, removal of asbestos, and removal of the large accumulations of pigeon droppings.
In 1987, JRA's redevelopment plan was amended so that it specifically authorized JRA to acquire fee simple title to the King Edward property. The amendment specifically provided that the acquisition was, "in order to encourage repair and rehabilitation of buildings located within" the area. Under the amendment, JRA hired appraiser T.E. Tate to do an appraisal of the property. Tate's appraisal stated that the market value of the property was $375,500, and JRA extended an offer to the owners on September 1, 1988, in that amount. On October 11, 1988, this offer was rejected. JRA hired another appraiser, James Davis, who found the market value of the property to be $865,000. Subsequently, JRA entered a resolution stating that it had, "determined that just compensation for the acquisition of unencumbered fee simple title to the property is $865,000." By letter dated July 28, 1989, JRA extended another offer to the owners to purchase the property for that amount. This offer was also rejected by the owners, and on October 18, 1989, JRA filed the present suit.
In his deposition of March 4 and 16, 1990, the Director of JRA testified that JRA had not engaged any marketing consultants, economists or real estate brokers in evaluating the future prospects of the King Edward should JRA acquire the property. He admitted that JRA had no plans to rehabilitate, market, keep secure or abate nuisances on the property. The purpose of the acquisition, according to him, was to remove a slum and blighted condition from the city. He could be no more specific about the use to which the property would be put than to say that it would probably be office space. He also related that he had previously talked with several inquirers about acquisition of the property and referred them to the owners.
Bill Cooke, an engineer with Cooke, Douglas and Farr in Jackson, testified that the cost of gutting the hotel would be approximately $696,000, excluding the costs of removing the asbestos and pigeon droppings. Demolition costs for the garage, according to Cooke, would be $207,000. JRA's expert appraiser, T.E. Tate, testified to estimates he had received from the Virginia Wrecking Company of $210,000 for asbestos removal, $117,884 for removal of the pigeon droppings and $186,000 to demolish the parking garage. The total costs to prepare the building for renovation, according to Tate's figures, would be approximately $1,024,598.
The parties came close on their figures of what it would take to recreate the shell of the hotel as it would stand after being "gutted." Cooke testified that the costs for that would be $4,594,483, while Richard Rauh, the owners' architect gave a figure of $4,083,317. Cooke testified that after gutting, $19,259,000 *1288 would create a like-new office building in the King Edward shell. Rauh did not give a corresponding figure, but did testify that to build a new building with the same area as the King Edward, the cost would be $11,401,600. To renovate the King Edward, Cooke estimated that the cost would be $80 per square foot, compared to the cost to build a new downtown office building, One Jackson Place, of $67 per square foot. However, on the cross-examination of JRA's appraiser, Mr. Tate, he admitted that the cost to renovate the King Edward would only be $64 per square foot after consideration of the 20% federal tax credit the owners would be entitled to for renovation of a building on the National Register of Historic Places.
The sole issue to be decided at an eminent domain proceeding is market value, and like most eminent domain proceedings, this one turned out to be a battle of appraisers. JRA's appraiser, Mr. Tate, arrived at a value of $375,500 for the entire property. Tate stated that of the cost, income and market approaches to valuation, the market approach gave the best prospects for valuation of this property. The income approach provided little insight, since the property was vacant and the cost approach proved inappropriate to him because of the difficulty of figuring depreciation on a building as old as the King Edward. Therefore, he found the market approach to be the most helpful. Tate then began with the premise that the King Edward could be best valued as if the land were vacant. In his opinion, the size of the King Edward made it unlikely that a private developer would want to renovate the property due to the extensive costs and speculative nature of the venture. Tate then analyzed other sales of property in the downtown area, looking particularly to the amount of the sales price allocated to the land, and came up with a value of the King Edward property as if vacant of $1,400,000. He then deducted the aforementioned gutting and removal costs to arrive at his valuation of $375,000.
The owners placed much attention on the properties Tate used in his appraisal and why he found them more or less comparable to the King Edward. Most criticized was Tate's comparison of the sales of property now known as the Security Centre. The Security Centre began as two separate buildings, the Milner and Petroleum Buildings, three blocks east of the King Edward. Without question, the sale was the closest in size to the King Edward, as the two buildings together had approximately 256,000 square feet. In 1984, that property sold for $3,800,000 to a large business enterprise which occupied about forty percent (40%) of the space. Tate discounted that sale greatly, finding that the location of the Security Centre on Lamar, Pearl and Pascagoula Streets, near the Deposit Guaranty Plaza, which Tate termed the 100% block, and that a large owner/occupant acquired the building made the sale less comparable than others. After the two buildings were acquired, the owners "gutted" them both and totally renovated them for office space as had been proposed for the King Edward.
The owners called Jerry Mask as their expert appraiser and he testified that in his opinion the King Edward property was worth $3,200,000 based on a highest and best use which he believed to be a mixed use of specialty shops, a luxury or moderately priced hotel, residential and office use. Mask also felt that the market approach gave the best valuation of the King Edward. He used some of the same comparables as Tate, but differed significantly in his comparison of the Security Centre sale to the King Edward property, finding it to be very comparable.

I.

WHETHER JRA HAS SHOWN PUBLIC USE AND NECESSITY FOR THE TAKING?

A. Necessity

The question of necessity for the taking may be dispensed with rather summarily. Whether the taking is necessary has consistently been held to be a legislative question which the courts should not disturb absent fraud or abuse of discretion. Governor's Office v. Carter, 573 So.2d 736, 739 (Miss. 1990). The burden of proof on this issue is on the landowner to prove one of these. Id. In this case, the owners put on no proof to show *1289 either fraud or an abuse of discretion on the part of JRA, therefore, the trial court could only find for JRA on this issue.

B. Public Use

This is the much more complicated issue in this case, and is subject to a different standard, which is rooted in Section 17 of our Constitution, which states:
Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.
Miss. Const. 1890, art. 3, § 17.
The condemnee may assert the lack of public necessity by virtue of Miss. Code Ann. § 11-27-15 (1972), which allows a defendant to file a motion at any time not less than five days prior to the hearing challenging, among other things, that the taking is not one for public use. Once the motion has been filed and the proceeding begun, it is the condemnor which has the burden of proving public use, unlike the question of public necessity, where the lack of public necessity must be shown by the owner. Pearl River Valley Water Supply District v. Brown, 248 Miss. 4, 156 So.2d 572, 576 (1963). JRA would then have the burden to affirmatively show the public use at the hearing rather than the owners being required to show a lack of public use.
That is not what happened in this case on the motion to dismiss. Not only did the owners call no witnesses, neither did the JRA, which had the burden of proof on the issue of public use. All that appears in the record of these hearings are the lengthy arguments of counsel for the parties, which fill nearly two full volumes. Mississippi Code Ann. § 11-27-15 (1972), does not set out the procedure for the hearing, it merely states that the motion to dismiss, "[s]hall be heard and decided by the judge as a preference proceeding, without a jury." However, the court cannot require the owners, who do not have the burden of proof on the issue of public use, to assume the burden of going forward with the evidence. To penalize owners for not doing so would be against the construction this Court has stated must be placed on the eminent domain statutes. In Mississippi Power & Light Co. v. Conerly, 460 So.2d 107, 111 (Miss. 1984), we reiterated that,
The right to exercise the power [of eminent domain] is strictly limited to the purposes specified in the statute conferring it. The proposed use of the lands of the owner must be clearly embraced within the legitimate object of the power conferred. Where there is any doubt in regard to the extent of the power, the landowner must have the benefit of that doubt.
Id. [quoting Wise v. Yazoo City, 96 Miss. 507, 51 So. 453 (1910)].
The record in this case does not reveal the specific purpose for which JRA wished to obtain the King Edward Hotel property. The resolutions by the Jackson City Council and JRA contain only bare allegations that the property was to be obtained for the purpose of slum clearance and redevelopment. What is revealed by the record on the question of public use seems to be merely a legislative assertion of public use, not any evidence that the use will in fact be public. The clear mandate of the Miss. Const. 1890, art. 3, § 17, that the question of public use be decided as a judicial, and not as a legislative question has not been complied with in this case.
As JRA points out, certain cases decided by this Court in the past seem to point to a different conclusion. Paulk v. Housing Authority of City of Tupelo, 195 So.2d 488 (Miss. 1967), is a case where this Court approved the use of eminent domain powers for urban renewal and slum clearance as a public use. There the owner argued that what the Authority was attempting was in fact a taking of private land for private use, by taking his land and selling it to another. He argued that his land had been cleared so that it no longer contributed to slum conditions. However, the Authority put on evidence at a *1290 hearing that at least part of the owner's land would be used for public streets. On the question of public use, we stated:
Neither has the public use ended because appellant's land is now clear. When a blighted area as a whole is subject to redevelopment, the condition of the condemnee's property is immaterial if the property lies within the designated project area and its acquisition is necessary to accomplish the paramount purpose of renewal. Hunter v. Norfolk Redevelopment and Housing Authority, 195 Va. 326, 78 S.E.2d 893 (1953).
Id. at 490.
The opinion also says that "it is not necessary for the condemnor to show final plans for every part of the land taken." Id. at 491. This is a very deferential view of the question of public use. See also, Jackson Redevelopment Authority v. King, 364 So.2d 1104 (Miss. 1978) (public parking facilities, along with incidental private enterprise held a public use).
The JRA relies on Pearl River Valley Water Supply District v. Brown, 248 Miss. 4, 156 So.2d 572 (1963), which involved acquisition of property near the banks of what would become the Ross Barnett Reservoir. In Brown, the Court relied on the earlier case of Culley v. Pearl River Industrial Commission, 234 Miss. 788, 108 So.2d 390 (1959), which held that the construction of a reservoir to provide recreation was indeed a public use. Culley further held that an incidental benefit to private parties from the taking did not deny the public character of the taking. Id. 108 So.2d at 400.
Again in Brown, the theme in allowing the taking was that where the use was public, incidental benefit to individuals did not affect the validity of the taking. The Court furnished examples of incidental uses which are necessary in support of primary, public uses and therefore valid exercises of the power of eminent domain. Along with "public parks, buildings, reservoirs, college campuses, schools, courthouses, airports, seaports, and office buildings," the public also requires parking lots, rest rooms, community houses, swimming pools, rental cottages in parks, restaurant facilities, and service stations provided by public sale or lease. "These uses are mere incidents to the primary and paramount public uses, but are nevertheless essential uses in connection with the primary public uses." Brown, 156 So.2d at 577.
Culley and Brown do not approve the type of taking this Court is confronted with in this case. The primary purpose of the taking by JRA is to sell the property to another private party who will develop the property. The incidental purpose is to remove slum and blighted conditions in downtown Jackson. This is not semantics. It is a matter of whether the takings clause is to have any validity at all and whether private property owners are to be afforded due process of law. The public purpose in Culley and Brown was direct: to provide needed recreation for the citizens of the state. Here, it is indirect and, at best, speculative. We require much more of a showing of public purpose than is shown here. In the words of Chief Justice Hughes:
[I]t would seem to be clear that a mere statement by the council that the excess condemnation is in furtherance of such use would not be conclusive. Otherwise, the taking of any land in excess condemnation, although in reality wholly unrelated to the immediate improvement, would be sustained on a bare recital. This would be to treat the constitutional provision as giving such a sweeping authority to municipalities as to make nugatory the express condition upon which the authority is granted.
Cincinatti v. Vester, 281 U.S. 439, 447, 50 S.Ct. 360, 363, 74 L.Ed. 950 (1930).
While that statement is probably no longer good federal law due to the recent deferential position taken by the United States Supreme Court on takings issues, it is the proper, skeptical manner in which to view such cases under Mississippi law. Similar reasoning in a Mississippi case may be found in Paulk, 195 So.2d at 492 (Smith, Justice, dissenting). After thoroughly reviewing the evidence of public use, Justice Smith concluded:
Here, apparently, the extent of the area and the lack of specificity of the public necessity are limited only by the unrestricted discretion of the Housing Authority commissioners.

*1291 There may remain some doubt that government boards and agencies have demonstrated that they may be counted upon to exercise such exceptionable judgment that it is always to be preferred to that of the private citizen in dealing with his own property.
Id. at 496.
Much of the record in this case is filled with complaint by JRA that the King Edward cannot be successfully developed. The owners bought the property believing that it could be. That the owners have not been successful in doing so during the period of time they have owned it should not require them to lose it. It is a serious task, and one which they seem to have been dedicated to. An investment of $450,000 up front and then expenses for taxes, security and renovation plans does not seem to be the kind of money that one would just want to throw down the drain.
On the question of public use, JRA has failed to meet its burden of proof and an evidentiary hearing is necessary to determine whether the use to which the land will be put has a primarily public purpose. A remand is therefore mandated.

II.

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING A 
CONTINUANCE?
The trial court did not commit reversible abuse of discretion in denying the continuance. Hudson v. Parvin, 511 So.2d 499, 500 (Miss. 1987).
Much of the confusion seems to have come from the original setting of the case for trial on March 6, 1990. The owners claim that the court's order did not allow them the ninety (90) days of discovery provided by Uniform County Court Rule 2.08, since that period would have ended March 20, 1990, and the court ordered them to submit their experts for deposition on February 21, 1990. They also claim the right to a continuance because of the withdrawal of lead counsel just before the hearing on the motion to dismiss which was held February 15, 1990.
The contention that the owners should not have been required to submit their expert witnesses for deposition at all may be disposed of quickly. Although Miss. Code Ann. § 11-27-7 does state that the owners will not be required to submit their statement of values until ten (10) days before trial, that does not mean that expert's opinions and basis therefor are not discoverable, according to the prior decisions of this Court. Hudspeth v. State Highway Commission, 534 So.2d 210 (Miss. 1988), disposed of this question.
From the facts in this record, this Court finds that a Hudson v. Parvin situation was not presented here and it was not an abuse of discretion to deny the continuance.

III.

DID THE TRIAL COURT ERR IN EXCLUDING THE DAVIS APPRAISAL BY THE GRANT OF THE MOTION IN LIMINE?
The owners contend that the Davis appraisal should have been admissible as evidence of the market value of the King Edward on October 21, 1989. JRA seeks to have this Court uphold the exclusion on the basis that the appraisal was part of an offer to compromise a disputed claim, which is inadmissible under Rule 408 of the Mississippi Rules of Evidence.
Offers to settle or compromise a disputed claim are clearly excluded. State Highway Comm. v. Warren, 530 So.2d 704 (Miss. 1988). "Offers or options to purchase property are not competent evidence to establish the fair market value of property." Mississippi State Highway Comm. v. Robertson, 350 So.2d 1348, 1350 (Miss. 1977). Sales of property to agencies with eminent domain powers should not be used as comparable sales in determining the market value of condemned property. State Highway Comm. v. Hyman, 592 So.2d 952 (Miss. 1991). These principles would clearly seem to foreclose any mention of the $865,000 offer by JRA. However, this does not dispose of the question of whether the appraisal on which the offer is based is inadmissible, since Rule 408 further provides that, "This rule does not *1292 require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."
JRA cites several federal cases for the proposition that anything prepared during the settlement negotiations is inadmissible under Rule 408. These cases do not apply to this case, however, since this appraisal was made before the petition was filed and any need for negotiations had arisen. Even though the threat of an eminent domain proceeding may have been looming on the horizon, the record reveals more of an armslength bargaining process such as might be entered between private parties. We have an offer, a rejection and then a higher offer, not the type of dispute over a "claim" contemplated by Rule 408. No claim existed until JRA filed the petition to condemn the property after their offer based on the Davis appraisal was rejected by the owners.
The Fifth Circuit Court of Appeals decided almost this exact question in United States v. 320.0 Acres of Land, 605 F.2d 762 (5th Cir.1979). When that case went to trial, the Department of the Interior sought to show a lower valuation than it had given the landowner pursuant to the law. The landowner sought to have the first appraisal admitted into evidence as an admission and to impeach the Department's appraiser, but the trial court ruled each time that the first appraisal was not admissible. The Fifth Circuit ruled that the appraisal and the Department's statement that the appraisal represented the best estimate of just compensation were admissions against interest and were not to be excluded under the federal counterpart to M.R.E. 408, which is virtually identical. The court first noted that, technically, no "disputed claim" existed in the case until eminent domain proceedings were initiated; thus F.R.E. 408 did not apply by its own language. Id. at 824-25.
The Fifth Circuit also distinguished between "offers" to purchase the property and mere "statements" of the Department's estimate of fair market value. The court noted that the policy reasons behind Rule 408, encouraging settlement of claims without resort to litigation, did not apply to the statements of fair market value, since the statement was mandated by law and reflected the Department's estimate of what it would have to pay in a condemnation proceeding. Allowing the statements into evidence would not discourage settlement of disputed claims since the statement still had to be made by law. Id. The Fifth Circuit's reasoning is sound and we adopt it in this case.
The majority of jurisdictions allow a party in a condemnation case to call as his own witness an appraiser retained, but not called, by the other party. Nichols, The Law of Eminent Domain, § 23.08[4] (Supp. 1990). However, the majority of courts which allow a party to call the other's appraiser do not allow the party to bring out the fact that the appraiser was retained to perform the appraisal for the opposite party. Id.
The rule allowing one party to call the other's appraiser is based on the courts' view that "an expert's opinion, when formed, and observation, when made, are facts and that every litigant is entitled to present all of the facts in support of his position." Id. at 23-114. The trial court's decision here to grant the motion in limine improperly prevented the owners from entering into evidence or using as impeachment the highly relevant appraisal done by Davis. In combination with the restrictions placed on the owners' prospects for securing other expert testimony through its pre-trial order, this error became even more prejudicial to the owners.
Admittedly, in another case, the Fifth Circuit has given F.R.E. 408 a broader ruling. In Ramada Dev. Co. v. Rauch, 644 F.2d 1097 (5th Cir.1981), the Fifth Circuit was faced with a suit against a builder for alleged defects. When the question of the defects first arose between the parties, the builder had one of its architects prepare an analysis of the defects, and at the later trial the plaintiff sought to introduce the written report in his case-in-chief. The Fifth Circuit found that the trial court had properly excluded the report under F.R.E. 408 after answering the dispositive question, "whether the statements or conduct were intended to be part of the negotiations toward compromise," in the affirmative. Id. at 1106-07 [citing 2 J. Weinstein *1293 & M. Berger, Weinstein's Evidence ¶ 408[03], at 408-20 to 21 (1980)].
The narrower view in United States v. 320.0 Acres of Land is much more applicable to the facts of this case. No disputed claim existed within the meaning of M.R.E. 408, so the rule does not apply and the trial court erred in excluding the use of the appraisal by Morley and Laurence, even though it correctly excluded the actual offer. On remand, the trial court should allow Morley and Laurence to call Davis as a witness to explain his appraisal report. However, in order that the jury not be swayed by prejudice, neither party shall inject that the appraisal was made at the request of JRA. Also, the resolution adopted by JRA stating that it found the fair market value of the property to be $865,000 should have been allowed into evidence as a statement against interest under M.R.E. 804(b)(3).

IV.

DID THE TRIAL COURT ERR IN ALLOWING JRA'S EXPERT TO REFER TO THE COHEN APPRAISAL DURING HIS REBUTTAL TESTIMONY?
As its case on rebuttal, JRA again called T.E. Tate, who had already testified in JRA's case-in-chief.
Early in his testimony on direct examination, the following exchange took place:
Q. All right, sir. In the course of your preparation of your opinions and testimony in this case and your appraisal, did you review and consider an appraisal report and deposition prepared by Mr. Richard Cohen who is employed by Mr. Morley and Mrs. Laurence as one of their appraisers in this case?
BY MS. MCLEOD: Objection, your Honor. Can we approach the bench?
BY THE COURT: Yes.
(BENCH CONFERENCE) [unrecorded by the court reporter].
BY THE COURT: We're going to take about a ten minute recess.
After the recess, the question was repeated in substance and the owners' attorney again objected, stating as her basis the fact that it would have been physically impossible for Tate to have relied on Cohen's January, 1990, report in preparing his appraisal made in 1988 and updated in 1989. The court allowed the testimony, stating that, "[t]he Court spent about ten minutes earlier on this matter, and under Rule 703 we're going to allow him to testify, and you have the right to cross examine him."
Tate went on to testify that Cohen stated in his appraisal that the office market was very over-built and weak, rental rates for office space were weak, the hotel market was weak, the retail market was weak, no comparable sales to the King Edward existed in Jackson, and that Cohen valued the land, if it were vacant, at $20 per square foot, the identical figure Tate used in his appraisal.
The owners contend that the entire line of questioning was improper rebuttal and a charade to allow into evidence the hearsay statements of Cohen. JRA contends that the hearsay statements were properly admitted under Rule 703 of the Mississippi Rules of Evidence to show the basis of the testimony given by Tate. Rule 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Rule 703 does not address whether the information relied on by the expert is admissible just by virtue of his reliance on it. The parties do not cite, and we cannot find any Mississippi case directly on point. However, a common sense analysis of this question compels us to find admission of these statements was error. The purpose of the line of questioning was not to show the basis of Tate's opinion of value, since Tate had already given detailed testimony on JRA's case-in-chief. A fair review of the record indicates that the sole purpose of this line of questioning was to relate to the jury that an appraiser hired by the owners had found the *1294 market for the possible uses of the King Edward to be weak. These statements testified to by Tate were obviously hearsay and just as obviously not offered to explain the basis for Tate's opinion, despite the allegation to the contrary, but to bolster Tate's earlier testimony and to impeach the owners' other expert witnesses.
U.S. v. Grey Bear, 883 F.2d 1382 (8th Cir.1989), cited by the owners, is most helpful on this point. There, the court found that while a witness may rely on information which is inadmissible in evidence, that does not give the witness the right to circumvent the rules of hearsay by giving statements which corroborate his view. Id. at 1392-93. Marsee v. U.S. Tobacco Co., 866 F.2d 319 (10th Cir.1989), is in a similar vein. There, the court found it proper to refuse to allow a doctor to testify as to what other doctors had told him about similar medical cases, which statements he relied on in forming his opinion. The court found that while his opinion based in part on the statements was admissible, the statements themselves were still inadmissible hearsay. The cases cited by JRA in support of admissibility are unpersuasive. None of them directly addresses the independent admissibility of the hearsay statements and one, American Fire Ins. Co. v. Falzone, 644 F.2d 65 (1st Cir.1981), explicitly states that while the jury may hear statements going to the basis of the expert's opinion, the jury should be instructed that the hearsay statements are to be considered for only that purpose and not for the truth of the statement.
The rule expressed in Marsee is particularly applicable to this case, especially in view of our discussion above and conclusion that, although a party may call the other party's appraiser, that party may not tell the jury that the appraiser was hired by his opponent. To do so invites an unfairly prejudicial inference that the appraiser was being held from the jury. The use of Cohen's report without the benefit of cross-examination, when combined with the error in allowing JRA's counsel to mention the fact that the owners hired Cohen constitutes prejudicial error.
Finally, the manner in which the trial court allowed the examination to proceed compels a holding that the court erred in even allowing Tate to be called as a rebuttal witness. "The party upon whom the affirmative of an issue devolves is bound to give his evidence in support of the issue in the first instance, and will not be permitted to hold back part of his evidence and offer it in rebuttal." Crawford v. City of Meridian, 186 So.2d 250, 253 (Miss. 1966). The trial court's tacit approval of this manner of rebuttal testimony clearly amounts to an abuse of discretion, for which we also reverse. Tate obviously could not have relied on Cohen's appraisal in forming his opinion of value, reached long before Cohen had ever heard of the King Edward. Even if he had relied on Cohen's appraisal in preparing for his testimony, that fact could have been brought out in JRA's case-in-chief as support for his own valuation conclusion, not in rebuttal as a back-door attack on the owners' case.

V.

DID THE LOWER COURT ERR IN REFUSING TO LET THE PROPERTY OWNERS CROSS-EXAMINE TATE ABOUT THE TAX APPRAISAL OF THE PROPERTY?
On cross-examination, the attorney for the owners asked Tate, JRA's expert appraiser, "[d]id you among the many things you considered look to or examine what this property is on the tax rolls for?" JRA objected to the question and the court held another of the legion of unrecorded bench conferences and then sustained the objection. JRA argues that evidence concerning the amount of the tax appraisal is inadmissible for any purpose, while the owners contend that the amount of the tax appraisal is admissible in itself, or at least to impeach Tate's testimony.
The question of the admissibility of hearsay relied on by experts on cross-examination is explicitly addressed under Rule 705 of the Mississippi Rules of Evidence, which states that, "the expert may in any event be required to disclose the underlying facts or data on cross-examination." This line of inquiry should have been allowed to determine *1295 whether the tax appraisal aided Tate in arriving at his determination of market value, and the lower court should not have sustained the objection.
In addition, the admissibility of appraisals of property for tax purposes presents a separate question not yet addressed by this Court. The owners contend that the assessment for tax purposes should be "independently admissible to impeach the opinion of JRA's expert," regardless of whether he relied upon the appraisal, since tax assessments in Mississippi must be based on the property's true value. Miss. Code Ann. § 27-35-49 (Supp. 1991).
The majority of states do not allow the use of property tax assessments to be injected at eminent domain proceedings for any purpose. See, Nichols' Eminent Domain, § 22.1, and collected cases. Many jurisdictions, however, do allow the assessments for impeachment purposes, particularly where the government's appraiser offers a lower value than the assessment. Sometimes the admission is simply labeled generically, "impeachment" evidence and often it is termed an admission against interest where the taxing authority and the condemning authority are the same.
Mississippi's tax assessors are directed by Miss. Code Ann. § 27-35-49 (Supp. 1991, eff. May 16, 1980) to appraise land according to its "true value." "True value shall mean and include, but shall not be limited to, market value, cash value, actual cash value, proper value and value for the purposes of appraisal for ad valorem taxation." Miss. Code Ann. § 27-35-50(1) (Supp. 1991, eff. 1980). Property such as the King Edward must be appraised according to its current use. Miss. Code Ann. § 27-35-50(4).
The method of valuation for ad valorem tax purposes obviously does not mirror the eminent domain concept of fair market value. Some of the same factors are used, however, in the different methods of valuation. We agree with the substantial minority of states which find tax appraisals admissible to impeach the government's appraisers, where the assessed valuation is related to market value. To do otherwise would be to ignore the reality of the situation and to withhold from the jury relevant evidence which it is then free to consider as it finds appropriate. Of course, counsel may argue to the jury why the tax appraisal is or is not sound evidence of market value and the jury is free to evaluate the evidence as it deems proper. As stated by one court, "we see no reason why the property owner in fairness should not be able to bring before the Commissioners evidence of an assessment valuation based on or related to market value which forms the very basis on which the very condemning authority in the case has been taxing that very property owner on the very land being condemned." New Castle County v. 16.89 Acres of Land, 404 A.2d 135 (Del. 1979).

VI.

WAS THE RESTRICTIVE COVENANT CLAIMED BY STANDARD LIFE A COMPENSABLE INTEREST IN PROPERTY?
When the Standard Life Insurance Company sold the King Edward property to Morley and Laurence in 1981, it inserted a covenant, which reads:
Subject, however, to the following covenants and restrictions, which shall be taken to be covenants running with the land and binding upon the Grantees, their heirs, administrators, executors, assigns and successors in Title: The property shall be used as offices, a hotel, apartments, commercial rental property or a combination of these. No part of the property shall be converted for use as a home for the elderly, a nursing home or as low rent, government subsidized housing.
JRA argues that restrictive covenants such as this are not compensable property interests in an eminent domain action, and that even if they are, this particular one is not compensable because the dominant estate is not identified, no proposed violation of the covenant has been shown and even if a violation is shown, damages are too speculative to allow. Standard Life's position is that their interest is a compensable property interest which has a value which may be determined by the effect on the market value of its own property if it is taken. The owners object to *1296 any holding that would diminish their recovery.
State courts are in disagreement over the question of whether compensation is due for the taking of a restrictive covenant and the United States Supreme Court has never decided the question. The majority of states have found such interests to be property for the purposes of the Fifth Amendment and their own takings clauses and thus subject to the due compensation principle. States which deny compensation generally find that restrictive covenants are not interests in land, but merely personal rights not covered by the takings clause. See, Annotation, 4 A.L.R.3rd 1137 (1965); Law of Real Property ¶ 679[4] (Supp. 1988). Many opinions which find such interests not compensable mention public policy reasons for the decisions, including the fear that recognition by the public that restrictive covenants are property interests would result in greater costs for government to acquire property and widespread proliferation of the covenants in order to thwart attempts by the sovereign to take property for public use. Stoebuck, Condemnation of Rights the Condemnee Holds in Lands of Another, 56 Iowa L.Rev. 293, 306-307 (1970); Anderson v. Lynch, 188 Ga. 154, 3 S.E.2d 85 (Ga. 1939).
We view as better reasoned those opinions that find such interests to be interests in real property for which due compensation must be paid upon a taking by the exercise of eminent domain powers.
These courts take a different view of the meaning of property. For example, in finding the taking of a right to assess fees against a parcel of property a right for which compensation was due, one federal appeals Court quoted an earlier U.S. Supreme Court decision:
It is conceivable that the [term "property"] was used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. In point of fact, the construction given the phrase has been the latter.
Adaman Mutual Water Company v. United States, 278 F.2d 842, 845 (9th Cir.1960) (quoting United States v. General Motors Corp., 323 U.S. 373, 377-380, 65 S.Ct. 357, 359-361, 89 L.Ed. 311 (1945)).
In a similar description of the scope of what constitutes "property" for purposes of the takings clause, Professor Stoebuck wrote:
For every burden on your land, someone else enjoys a corresponding benefit or right. Physicists tell us that matter may not be destroyed  altered in form or transformed into energy, but not destroyed. And so with the interests in land; they may be redistributed, but the totality of absolute ownership will always exist somewhere, though scattered among the state and various individuals... . If your land is burdened by private restrictions known as restrictive covenants, servitudes, or negative easements [your neighbor] still has a property interest, though of a negative rather than positive sort. Matter has simply been altered in form.
Stoebuck, Condemnation of Rights the Condemnee Holds in Lands of Another, 56 Iowa L.Rev. 293, 293 (1970).
Both Professor Stoebuck and the Court in Adaman note that restrictive covenants have more in common with other interests accepted as property than not. Restrictive covenants generally must be created by a deed, be properly recorded, pass the Statute of Frauds and, once created, they run with the land. They, therefore, have more in common with real property than with property outside that rubric. Adaman, 278 F.2d at 849; Stoebuck 56 Iowa L.Rev. at 305. "Because the transfer of these rights and duties are subject to legal principles different from those which concern the passing of other interests, a unique, direct connection with the land is established. This connection justifies the distinction [between property and other rights]." Adaman, 278 F.2d at 849. The Adaman Court finally compared restrictive covenants to easements, which universally require compensation when taken, and concluded, "[b]oth interests are directly connected *1297 to the land and we are unable to find a distinction between them which will justify dissimilar treatment at the hands of the condemning authority." Id. at 849.
Clearly, Standard Life kept one of the "bundle of rights" which made up the complete estate when they sold the King Edward to Morley and Laurence. For this reason JRA's argument that only where the dominant estate is mentioned in the instrument containing the covenant may the owner of the dominant estate be entitled to compensation unpersuasive. The "stick" Standard Life kept is the right of Morley and Laurence or their successors in title to build housing for the elderly, a nursing home, or government subsidized housing on the property. In order for the owners or their successors to use the property for any of these purposes, they would have to buy this right back from Standard Life. Would any prudent buyer seeking to purchase the property for one of those uses do so without purchasing this right? Would they not want, indeed, need a deed showing that Standard Life had sold the rights back to the owners? Certainly. To do otherwise would be to buy a lawsuit. Without a repurchase of the rights, the title to the property would be unmarketable.
Therefore, this Court finds that the restrictive covenant in favor of Standard Life is an interest in land subject to the due compensation principle under Section 17 of our Constitution.
Having found the restrictive covenant is an interest in land subject to compensation, it is necessary to discuss the method of calculating that compensation.

Method of Calculating Compensation Due
We have heretofore strictly adhered to the "unit rule." We set out the basis and application of the rule in Lennep v. Mississippi State Highway Commission, 347 So.2d 341 (Miss. 1977), quoted in Mississippi State Highway Commission v. Doughtrey-Hughes, Inc., 375 So.2d 413, 414 (Miss. 1979).
It is clear that the legislature intended for the unit valuation method to be applied in determining compensation in eminent domain cases. Mississippi Code Annotated, Section 11-27-5 (1972). We have consistently followed the statutory mandate and use the unit valuation method for determining compensation where property sought to be condemned involves a leasehold interest. In Lee v. Indian Creek Drainage District, 246 Miss. 254, 148 So.2d 663, 666 (1963), we stated
Where there are different interests or estates in the property acquired by condemnation, the proper course is to ascertain the entire compensation to be awarded as though the property belonged to one person and then apportion this sum among the different parties according to their respective rights.
Accord, State Highway Comm. v. Rankin County Board of Ed., 531 So.2d 612 (Miss. 1988).
Nichols' The Law of Eminent Domain, Sackman (3rd Ed. 1990) points out the difficulty of valuation of restrictive covenants by the traditional unit rule:
There is no doubt a property may be restricted by means of a covenant running with the land to a use which is quite consistent with its highest and best use on the date of the condemnation. Thus, a servient tenement will have a value at least in theory equaling its value as unencumbered. Yet, the restriction imposed in favor of one or more other properties may be of substantial value to those properties. Thus, the "unit rule" has no application.
Id. at § 12.05[4][h], p. 129.
The proper method of valuation is the difference between the market value of the dominant estate before and after the taking. Standard Life urges the Court to adopt this view.
However, that view is fundamentally incompatible with the reality that the covenant gives Standard Life an interest in the King Edward property. The unit rule requires that in this case, a value be assessed on the fee simple interest in the King Edward, then that amount be apportioned among the owners and Standard Life, according to their respective interests.
JRA insists that any damages to Standard Life's covenant are purely speculative and *1298 thus should not be compensable. However, Standard Life's covenant is plainly being extinguished. We recently stated that:
Because our constitution requires "due compensation"
the presumption is that the construction will be of such character as to do the most injury to the remaining property of the landowner.
4 Nichols, The Law of Eminent Domain § 14.15, pp. 14-327 thru -329 (Rev. 3d Ed. 1990). This view is a function of the policy imperative that compensation and damages be payable once and for all and not piecemeal. One policy imperative of the before-and-after rule for more than half a century has been that the landowner's entire right and the Commission's entire liability will be resolved in a single action. That rule gives the landowner substantial incentive to discover and show all special damages.
King v. Miss. State Highway Commission, 609 So.2d 1251, 1254 (Miss. 1992) (footnote omitted).
Although we made these statements in an inverse condemnation case, the rationale applies equally to the facts in this case. The lower court was presented with ample evidence that the restrictive covenant had value. Therefore, it erred in granting summary judgment against Standard Life.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED TO THE SPECIAL COURT OF EMINENT DOMAIN OF HINDS COUNTY, MISSISSIPPI.
HAWKINS, C.J., DAN M. LEE, P.J., PITTMAN, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
PRATHER, P.J. and BANKS, J., not participating.